**MEAT & ALLIED FOOD WORKERS LOCAL NO. 248 a/w Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO, Plaintiff,**

v.

**PACKERLAND PACKING CO., INC., Defendant.**

No. 74-C-577.

United States District Court, E. D. Wisconsin.

May 4, 1976.

Gerry M. Miller, Goldberg, Previant & Uelmen, Milwaukee, Wis., for plaintiff.

James A. Gilker, John F. Buergler, Fort Smith, Ark. by Bernard Berk and Joseph A. Hoida, Green Bay, Wis., for defendant.

## MEMORANDUM OPINION

WARREN, District Judge.

This is an action whereby the plaintiffs named above seek to obtain judicial confirmation and enforcement of an award entered in a labor arbitration proceeding on October 8, 1974. An application for such relief was filed on December 5, 1974, and an answer to that application was submitted on December 20, 1974.[1] Counsel for the plaintiffs have filed various memoranda of points and authorities in support of their particular positions; counsel for the defendant have filed a motion for summary judgment together with their own supporting brief.

This memorandum opinion serves to resolve the several issues that are outstanding at this time.

### I.

The factual background to this controversy is set out with great detail in the arbitration award opinion entered on October 8, 1974 by Arbitrator Howard S. Bellman. Said opinion is attached hereto as Appendix A. At this juncture it will be sufficient to note that it is undisputed that the award of backpay thereby granted has never been honored by the defendant.

### II.

Counsel for the plaintiffs in this case have alleged that this Court enjoys jurisdiction over this matter pursuant to certain provisions of both the Arbitration Act and

---

1. The Court deems the document filed December 5, 1974 and labeled "application" to be a complaint within the meaning of Rule 3 of the Federal Rules of Civil Procedure.

the Labor Management Relations Act. *See:* 9 U.S.C. § 9 and 29 U.S.C. § 185, respectively. Counsel for the defendant initially challenge these jurisdictional assertions and claim that the Court is without power to enter any award of enforcement at this time.

The parties at this proceeding do not dispute the fact that they had entered into a collective bargaining agreement which was in full force and affect at all times material hereto.[2] Article 4 Section 2 of said agreement contains a specific provision whereby a grievance which is not satisfactorily adjusted is to be submitted to an impartial arbitrator whose decision in the grievance is to be final and binding.[3]

In a situation such as the foregoing, it is generally thought that a district court has jurisdiction to confirm and enforce the final arbitration award that is entered. Despite any qualifications to jurisdiction imposed by the terms of the Arbitration Act, 9 U.S.C. § 1 *et seq,* the refusal of one of the parties to a collective bargaining agreement to abide by an arbitrator's decision is seen as an unfair labor practice within the meaning of the broad jurisdictional provisions of section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a).[4] *See, e. g., Truck Drivers v. Gateway Erectors Division,* 91 L.R.R.M. 2180, 2181 (S.D.Ohio 1975).

*Compare: Varley v. Tarrytown Associates, Inc.,* 477 F.2d 208 (2d Cir. 1973); and *I/S Stavborg v. National Metal Converters, Inc.,* 500 F.2d 424 (2d Cir. 1974).

"The Supreme Court has held that a party to a collective bargaining agreement may sue in federal court pursuant to Section 301 of the LMRA to specifically enforce a promise to arbitrate. *Textile Workers of America v. Lincoln Mills of Alabama,* 353 U.S. 448, 451, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). In reaching this decision the Court made no mention of the Arbitration Act.

"In the wake of *Lincoln Mills,* the Court also held that a suit may be maintained by a party to a collective bargaining agreement under Section 301 to enforce the award of an arbitrator. *General Drivers, Warehousemen & Helpers, Local Union No. 89 v. Riss & Company,* 372 U.S. 517, 519, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963); *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 596, n. 1, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). The Court again made no mention of the Arbitration Act."

*White Motor Corp. v. International Union, etc.,* 365 F.Supp. 314, 316 (S.D.N.Y. 1973) [aff'd, 491 F.2d 189 (2d Cir. 1974)].

The power to enforce the award of an arbitrator is seen as but one method by

---

**2.** As alleged in the application for relief and admitted in the answer, the parties to this action entered a collective bargaining agreement effective June 1, 1971 and thereafter through February 28, 1975. A true copy of this agreement is attached as exhibit "A" to the application for enforcement filed December 5, 1974.

**3.** Article 4 Section 2 of the agreement described in footnote # 1 reads in full as follows:
   "Section 2: Arbitration Provision—If at the final step of the grievance procedure the matter is not satisfactorily adjusted, the grievance may be submitted to an impartial arbitrator to be selected by mutual agreement of the parties. A written request for arbitration shall be made within fifteen (15) days of the Step 3 answer. If within fifteen (15) days after receipt of such written request the parties are unable to agree upon an arbitrator, either party shall request a list of five names from the Federal Mediation and Conciliation Service and strike names to determine which one shall sit on the arbitration. His decision in the grievance shall be final and binding upon the employee(s) involved and upon the parties to this Agreement, provided he shall not have authority other than to apply the terms and conditions specifically set forth in the Agreement. It is recommended that the Arbitrator shall submit his decision, in writing, within thirty (30) days after the conclusion of the hearing or hearings as the case may be. The compensation and necessary expenses of the arbitrator shall be borne equally by the Company and the Union."

**4.** The answer filed on behalf of the defendant Packerland Packing Co., Inc. on December 20, 1974 admits at paragraph II that it is a corporation engaged in or affecting commerce, as required by the terms of 29 U.S.C. § 185(a).

which a district court carries out the congressional and national policy in favor of arbitration of labor disputes, as codified by the enactment of the National Labor Relations Act. *See, e. g., Pacific Maritime Association v. International Longshoremen's and Warehousemen's Union et al.,* 304 F.Supp. 1315, 1316 (N.D.Calif.1969), *aff'd,* 454 F.2d 262 (9th Cir. 1971).

Recognition of this public policy in favor of arbitration has been reaffirmed by the decisions of the courts of this judicial circuit. *See, e. g., Inland Steel Co. v. Local Union No. 1545, United Mine Workers of America etc.,* 505 F.2d 293, 298 (7th Cir. 1974).

■ In view of the foregoing, the Court concludes that any challenges to jurisdiction to enforce the final and binding arbitration award at issue here must fail.

### III.

Once jurisdiction to enforce the award of the arbitrator has been established, this Court is entitled to review the merits thereof. Such review, however, is to be exercised in a very circumscribed fashion.

■ Essentially, the Court has power to review and set aside a particular labor arbitration award only if the grievance is not arbitrable, if the arbitrator exceeds his contractual authority, if indicia of fairness are absent, if the decision of the arbitrator is arbitrary or capricious, or if the process is tainted by fraud or deceit. *See: Cannon v. Consolidated Freightways Corp.,* 524 F.2d 290 (7th Cir. 1975) [cases cited at pp. 294–295]; and *Mogge v. District 8, International Ass'n of Machinists,* 454 F.2d 510 (7th Cir. 1971).

Furthermore, labor arbitration awards which do not "draw their essence" from a pertinent collective bargaining agreement are subject to judicial vacation. *See, e. g., Master Sheet Metal Workers, etc. v. Local Union No. 17 et al.,* 397 F.Supp. 1372 at note 15 (D.R.I.1975). This proviso has been interpreted such that:

" . . . a labor arbitrator's award does 'draw its essence from the collective bargaining agreement' if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award."
*Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123, 1128 (3d Cir. 1969).

Counsel for the defendant argue that the award in question here was both arbitrary and capricious in nature, and beyond the scope of the relevant collective bargaining agreement. The Court disagrees.

■ The arbitrator found that the backpay award in question was appropriate because the 30-day suspension giving rise thereto was not "for cause" as required by article 3 section 1 of the bargaining agreement. This determination was supported by clear logical analysis and cannot be said to be arbitrary.

In addition, the award drew its "essence" from the bargaining agreement because, in accordance with the definition of that term noted above, it was rationally derived from the agreement and not in total disregard thereof. As stated in the preceding paragraph, management agreed to suspend or discipline only "for cause." The arbitrator rationally found cause to be wanting. An award of backpay is not an unreasonable remedy to correct that particular breach.

"When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency."

*United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 597, 80 S.Ct. 1347, 1361, 4 L.Ed.2d 1409, 1428 (1960).

The labor arbitration award at issue here is not to be vacated as frivolous or arbitrary or not derived from the essence of the collective bargaining agreement. Generally speaking, this Court can find no basis upon which to interfere with the arbitrator's decision, and thus no alteration thereof is warranted. *See: Papenfuss v. Abe W. Mathews Engineering Co.,* 397 F.Supp. 165 (W.D.Wis.1975).

### IV.

■ Counsel for the plaintiffs have requested that any decree affirming the labor arbitration award at issue include a provision for an award of interest. In order to make the complaining employee whole, interest at the rate of 6 percent from the date of the arbitration award is to be granted. *See: Local Union 494 etc. v. Artkraft, Inc., et al.,* 375 F.Supp. 129 (E.D.Wis.1974).

### V.

■ Counsel for the plaintiffs have also requested an award of attorneys' fees if they prevail. In light of the complexities of the issues here the Court cannot find this particular dispute to have been raised in bad faith. Because of this fact, and in view of recent commentary by the United States Supreme Court concerning the propriety of awards of attorneys' fees, this request will be denied in this particular proceeding. *See generally, Alyeska Pipeline Service Co. v. Wilderness Society et al.,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1974).

### VI.

After due consideration of the position of each party, as set out in the written record in this action to date, and for the reasons stated in the foregoing memorandum opinion,

THE COURT FINDS that jurisdiction over this dispute exists pursuant to the provisions of § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a);

THE COURT FURTHER FINDS that no sufficient cause has been shown to warrant interference with the labor arbitration award at issue here,

THE COURT THEREFORE ORDERS that the labor arbitration award entered among these parties on October 8, 1974 by Arbitrator Howard S. Bellman is hereby enforced in its entirety;

THE COURT FURTHER ORDERS that the monetary sum due under the terms of that award shall include interest at the rate of 6 percent per annum from October 8, 1974;

THE COURT FURTHER ORDERS that the motion for summary judgment filed on behalf of the defendant is hereby DENIED.

This case is closed without taxation of costs or attorneys' fees to any party.

### APPENDIX "A"

### BEFORE THE ARBITRATOR

In the Matter of the Arbitration
of a Dispute between
PACKERLAND PACKING CO., INC.
and
LOCAL 248, MEAT & ALLIED
FOOD WORKERS

*Appearances:*

> Mr. Edmund V. Bobrowicz, Business Manager, Local 248, Meat and Allied Food Workers, for the Union.
> Berk and Pressentin, Attorneys at Law, by *Mr. Bernard Berk,* for the Company.

### *ARBITRATION AWARD*

Pursuant to the procedures of the Wisconsin Employment Relations Commission (Dec. No. 12854, July 10, 1974) and the Federal Mediation and Conciliation Service (Case 74K 12441) the undersigned was appointed as an Arbitrator to determine a dispute existing between Packerland Pack-

ing Company, Inc., referred to herein as the Company, and Local 248, Meat and Allied Food Workers, referred to herein as the Union, with regard to certain issues, specified below, arising out of the suspension of Peter Samuelson, referred to herein as the Grievant.

This proceeding is in accordance with final and binding arbitration provisions of the parties' June 1, 1971 collective bargaining agreement. A hearing was held in Green Bay, Wisconsin, on September 13, 1974. No transcript was made of said hearing.

*THE ISSUES:*

At the hearing the parties stipulated that the following issues are to be determined herein: (1) Was the April 10, 1974 suspension of the Grievant for "cause"; and, if not, (2) What remedy is appropriate?

*RELEVANT CONTRACT PROVISIONS AND PLANT RULES:*

Article 3, Section 1 of the collective bargaining agreement states:

"The management of the plant and the direction of the working force, including the right to hire, suspend, discipline or discharge for cause, . . . are vested exclusively in the Company, . . ."

Company Work Rule # 7 is violated by any employe "Leaving work area without supervisor's permission."

*FACTS:*

On April 8, 1974, the Grievant and co-employe Todd Bardwell returned to work with the Company, pursuant to an arbitration award which reinstated them 15 months after their discharge for refusal to accept a work assignment. Both the Grievant and Bardwell arrived at the plant around 5:00 a. m., unaware that a meeting with Company president Frankenthal was to be held before they could return to work as "boners" on the 5:00 a. m. shift.

At 7:00 a. m. the Grievant and Bardwell met with Frankenthal, plant superintendent Rotter, and Union Steward Vander-Walker. Frankenthal discussed the provisions of the arbitration award with both employes and had Bardwell read several Company work rules, including Work Rule # 7, aloud. Frankenthal also advised the Grievant that he should get his hair cut. At 7:15 a. m. the meeting ended and the Grievant and Bardwell went to work in the boning room.

By approximately 10:45 a. m. no more meat was available for boning. While most "boners" finished boning the slabs of meat in front of them, the Grievant and Bardwell were assigned clean-up duties by foreman McAbee. Such duties are often assigned to employes who, like the Grievant and Bardwell, did not start work at the beginning of the shift.

Although there is some conflict in the testimony as to how McAbee phrased his clean-up assignment to the Grievant and Bardwell, the Arbitrator finds that McAbee stated, "Clean up the boning tables and then you can go." (This finding is in accordance with the Grievant's testimony and McAbee acknowledged that he might have so stated.) As both employes had cleaned the boning tables in the past, more explicit instructions were not given.

It is the practice under the above-quoted Company rule that employes check in with their supervisors before leaving the plant. When assigned clean-up duties in the past, the Grievant had generally reported to the foreman before leaving.

The Grievant and Bardwell performed some clean up of the boning tables before punching out at 11:00 a. m. A third employe who had been helping with the boning table clean up was still working at the time the Grievant and Bardwell left. Neither the Grievant nor Bardwell checked with McAbee before leaving the plant although he was present in his office near the time clock. McAbee did not see either individual leave the plant.

At approximately 11:15 a. m. McAbee looked for the Grievant and Bardwell, intending to instruct them to help the three

employes who were still cleaning the adjoining packing tables. Not finding either employe, McAbee pulled their time cards and told plant superintendent Rotter that the two employes had left without his permission. Rotter informed Frankenthal regarding the incident on Tuesday, April 9, and received instructions to set up a Wednesday morning meeting with the Grievant and Bardwell. There was no work on Tuesday, April 9.

When the Grievant and Bardwell reported for work Wednesday morning, April 10, McAbee told both employes that Frankenthal wished to see them about their having left work on Monday without permission. The Grievant replied that he had done exactly what he had been told. McAbee, the Grievant, and Bardwell proceeded to Frankenthal's office where Frankenthal and Rotter were waiting. Preliminary discussion involved both the Grievant and McAbee explaining their positions on the matter. Frankenthal then asked the Grievant and Bardwell if they would like to have a Union official present during the meeting. The Grievant indicated that he'd like to have Union Steward Christiansen present and Rotter left immediately to find Christiansen.

While awaiting the arrival of the Union Steward, Frankenthal and the Grievant discussed the former's request that the Grievant get a hair cut. Although the Grievant had complied with Frankenthal's instruction, he told Frankenthal that he felt it was discriminatory to maintain different hair length standards for male and female employes. Frankenthal responded by indicating that the Grievant was free to file a discrimination complaint. The Grievant informed Frankenthal that he had already done so.

When Rotter returned with Christiansen, Frankenthal asked that everyone wait outside of his office while he talked to Bardwell. The Company president told Bardwell that he was considering imposing a seven-day disciplinary suspension for viola-

tion of Work Rule # 7. After some discussion, Frankenthal agreed to suspend the seven-day suspension pending further violations. Bardwell left the office without speaking to the Grievant and Frankenthal rejoined the Grievant, Christiansen, Rotter, and McAbee.

The discussion which then ensued respecting the Grievant's alleged misconduct is also a matter of conflicting testimony. Apparently, Frankenthal stated that he was considering imposing a seven-day disciplinary suspension for violation of Work Rule # 7. Steward Christiansen then asked the Grievant for his thoughts, to which the Grievant replied, loudly enough to be heard by Frankenthal, and in strong terms, that he did not care if he was given a thirty-day suspension. Hearing this, Frankenthal asked the Grievant if he really wanted a thirty-day suspension, to which the Grievant answered that he did not care. Frankenthal, thereupon, ordered the thirty-day suspension grieved herein.

The evidence indicates that this discussion was heated and agitated. Realistically, it must be viewed in the context of the recent reinstatement from the unsustained discharge, and the current antagonism over the Grievant's hair, as well as the immediate incident.

## THE POSITIONS OF THE PARTIES:

The Union contends that the Grievant did not violate Work Rule # 7 and that therefore the suspension was not for "cause". It urges that the Grievant was obeying instructions given by foreman McAbee which, in effect, gave the Grievant permission to leave when he had performed his duties without again checking with McAbee.

Even if the Grievant were guilty of the alleged violation, the Union argues, the thirty-day suspension was an unwarranted punishment for the offense; specifically in light of the seven-day suspended disciplinary suspension accorded co-employe Bardwell.

The Company contends that the Grievant violated Work Rule # 7 and that therefore

his suspension was for "cause". It is alleged by the Company that the Grievant never received permission to leave the plant from foreman McAbee.

The Company urges that the Grievant would have received discipline identical to that accorded Bardwell but for his insubordinate conduct during the April 10 meeting with Frankenthal, during which he "suggested" and "accepted" the greater penalty.

*DISCUSSION:*

It is undisputed that Company employes are required to obtain a supervisor's permission before leaving the plant. The Grievant himself testified that it was his general practice, with some exceptions, to check with his supervisor before punching out. It is also established that the Grievant did not check with foreman McAbee before leaving the plant at 11:00 a. m., Monday, April 8. Combining these two facts, a question arises as to whether the Grievant received permission to leave the plant at any time prior to 11:00 a. m. In other words, was it reasonable for the Grievant to interpret foreman McAbee's clean-up instructions as giving him advance permission to leave the plant. If the Grievant's interpretation was reasonable, a finding that he violated Work Rule # 7 cannot be supported.

Although the foreman's instructions, "Clean up the boning tables and then you can go.", were ambiguous in that they might have meant either, "You can go as soon as you have completed the task." or "I will permit you to go as soon as you have reported to me that you have completed the task."; in the context of the Grievant's knowledge of the prevailing practice and Work Rule, the second interpretation was clearly the likely one.

Thus, it is concluded that the Grievant was not given advanced permission to leave the plant, and therefore, by leaving violated Work Rule # 7.

Regarding the thirty-day suspension imposed for this infraction, the testimony of Company president Frankenthal indicates that the Grievant would have received the suspended seven-day suspension accorded Bardwell, but for the Grievant's comments during the April 10 meeting. Thus, the Arbitrator must judge whether the Grievant's conduct during the April 10 meeting justified the imposition of a penalty beyond the seven-day abated suspension.

There is no doubt that the Grievant's statement was ill-considered, although the emotional setting of the discussion provides a partial explanation for the comment. However, the ill-considered statements, especially inasmuch as they were not directed specifically at Frankenthal, did not justify excessive action by the Company in the form of a thirty-day suspension. Any claim that the suspension was implemented because Grievant indicated that he "didn't care" if it occurred is tinged with the same type of unreasonable and unrealistic literal interpretation which the Grievant applied to McAbee's instructions. Clearly Grievant's instantaneous comment cannot be equated with a genuine desire to see such a significant loss of earnings inflicted upon himself.

The seven-day abated suspension originally contemplated as discipline by the Company is the proper penalty for Grievant's violation of Work Rule # 7.

### AWARD

On the basis of the foregoing, and the record as a whole, it is the decision and Award of the undersigned Arbitrator that the April 10, 1974 thirty-day suspension of the Grievant was not for cause; that said suspension should be reduced as it is reflected in the Company's records to a suspended seven-day suspension; and that the Company should immediately pay to the Grievant an amount of money equal to that which he would have earned had he not been improperly suspended, less any amount of money that he earned or received while suspended that he otherwise would not have earned or received.

Dated at Madison, Wisconsin, this 8th day of October, 1974.

By Howard S. Bellman /s/
   Howard S. Bellman, Arbitrator