WATERTOWN FIREFIGHTERS, LOCAL 1347, I.A.F.F., AFL-CIO *vs.* TOWN OF WATERTOWN.

Middlesex. September 14, 1978. — November 27, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Arbitration. Municipal Corporations*, Collective bargaining, Group insurance. *Insurance*, Group. *Interest.*

A provision in a "last and best offer" arbitral award, requiring a town to continue to pay 50% of a group insurance premium for firefighters, for which it had previously obligated itself under G. L. c. 32B, § 7, and, in addition, to make a lump sum payment during the ensuing year equal to 25% of the premium due for that year, was invalid, since the statutory scheme provided for equal treatment of employee groups and since the town had not accepted G. L. c. 32B, § 7A, which authorizes municipalities to supplement the 50% contribution. [710-716]

376 Mass. 706                                        707

Watertown Firefighters, Local 1347, I.A.F.F., AFL-CIO *v.* Watertown.

Where an invalid provision in a "last and best offer" arbitral award
   had been separately considered by the arbitrators, where the arbi-
   trators would surely have approved the offer without the invalid
   provision, and where there was no practical difficulty of managing
   the modified award, the invalid provision was severed and the rest
   of the award enforced. [716-717]
Interest on a "last and best offer" arbitral award ran from the date
   of the award. [717-719] .

CIVIL ACTION commenced in the Superior Court on July
11, 1977.

The case was heard by *Arthur Williams*, J., a District
Court judge sitting under statutory authority.

The Supreme Judicial Court granted a request for di-
rect appellate review.

*Brian T. Callahan* for the defendant.

*Jonathan P. Hiatt* for the plaintiff.

KAPLAN, J. On this appeal we return to that form of
"interest" arbitration called "last and best offer," a sub-
ject discussed recently in *Marlborough Firefighters, Lo-
cal 1714* v. *Marlborough*, 375 Mass. 593 (1978).[1] In the
present case the town of Watertown, defendant, appeals
from a judgment of the Superior Court directing enforce-
ment of a last and best offer arbitral award. The town
claims that the award includes an invalid provision as to
group insurance.[2] We agree with the town. We shall also
deal with other questions, including the effect of the inva-
lidity on the rest of the award.

The town and the plaintiff, Local 1347, International
Association of Firefighters, AFL-CIO (hereafter called
the union), were parties to a collective bargaining agree-
ment running to June 30, 1976, and for succeeding years
until superseded. As authorized by the contract, the par-

---

[1] See generally J.L. Stern et al., Final Offer Arbitration (1975); So-
mers, An Evaluation of Final-Offer Arbitration in Massachusetts, 6 J.
Collective Negotiations in the Pub. Sector 193 (1977).

[2] As will be seen, we use the term "invalid" as a shorthand for the
proposition that a statutory policy exists concerning the particular
subject which may not be frustrated by means of arbitration.

708 376 Mass. 706

Watertown Firefighters, Local 1347, I.A.F.F., AFL-CIO v. Watertown.

ties began negotiations for a successor agreement in October, 1975, but that failed of result, as did subsequent mediation. Therefore fact-finding took place under G. L. c. 150E, § 9, eventuating in a report on November 12, 1976. This, too, failed to move the parties to a settlement, and on the union's petition to the Board of Conciliation and Arbitration, last and best offer arbitration was initiated on April 26, 1977, before a panel of three arbitrators under St. 1973, c. 1078, § 4.[3]

The panel conducted hearings on six dates from April 27 to May 26, 1977. On some points of a new contract, agreement had been reached previously, and on a few others agreement was attained at the hearings. Notable among the still disputed topics was wages.[4] This was considered in terms of the statutory criteria.[5] Thus there was analysis of the town's economic standing and ability to pay in comparison with other municipalities; of the firefighters' compensation, also in a comparative sense; and of the need for maintaining employees' purchasing power.

As to group insurance (including medical coverage), the union had proposed during fact-finding that the town increase its contribution to premiums by 25%—to be added to the 50% it had theretofore obligated itself to contribute under G. L. c. 32B, § 7.[6] The union put its proposal on the ground that the particular employment carried special health hazards, and it noted that some comparable communities were already contributing

---

[3] This statute was later amended in certain respects by St. 1977, c. 347, § 2.

[4] Besides the wage and insurance questions, the matters remaining in controversy included vacation, bereavement and sick leave, paid holidays, and protective clothing and uniforms.

[5] Arbitrators are adjured by the statute to consider ten matters among others that may be relevant.

[6] Chapter 32B permits municipalities to elect to provide group insurance with certain coverages for their employees and their dependents. "Acceptance" by a municipality takes place under § 10.

more than 50%. The fact finder had supported the union's position. At the arbitration hearings the town pointed out, first, that the allowance of any increase of the town's contribution to group insurance would require legislative action by the town under G. L. c. 32B, § 7A, because it would constitute an additional rate,[7] and, second, that no such increase could be allowed for firefighters alone: by force of a 1973 amendment of that section, the increase would have to be provided for all the town's employees under group insurance.[8] The question whether the town was willing to accept § 7A and contribute more than 50% across the board was actually put to the annual Watertown town meeting on May 16, 1977, in the form of an article on the agenda for the meeting. The vote was negative ("to postpone indefinitely").

Last and best offers were submitted by the parties on May 26. With respect to wages, the union proposed an increase of 10% in the first year (commencing July 1, 1976) and 5% in the second; the town proposed 8% and 5%. As to any additional contribution by the town to group insurance premiums, the town, as might be expected, made no proposal; the union attempted one, which we paraphrase as follows. There was to be written into the new contract covering the firefighters a provision entitled "insurance," by which the town was to continue to pay 50% of the premium to the insurer. Starting on July 1, 1977, this contribution was to be supplemented by a lump sum payment to the firefighters during the ensuing year equal to 25% of the premiums due for the year. But if the town should increase its across-the-board contribution paid to the insurer above 50% (presumably by reversing the town vote), the lump sum payment would be scaled down accordingly.[9]

[7] In order to contribute a subsidiary or additional rate, the municipality must separately accept § 7A as therein stated.

[8] The addendum to the first paragraph of § 7A, inserted by St. 1973, c. 789, § 1, is set out in the text below.

[9] The proposal was set out as art. XV of the union's offer (corre-

On June 3, 1977, a majority of the panel approved the union's offer, and on July 3 they filed a statement explaining their choice of the "package." On July 11 the union commenced the Superior Court action to enforce the award. On an agreed record (whose content in material part we have recounted herein), the judge, without opinion, held for the union and directed compliance with the award, with interest from the date of the award. We granted direct appellate review on the application of both parties.

1. *Invalidity of the insurance provision of the union's offer.* In 1955 the Legislature enacted G. L. c. 32B, a comprehensive statute empowering municipalities to provide group insurance (medical and certain other coverages) to their employees and their employees' dependents. Upon its acceptance of the provisions of c. 32B on March 4, 1957, Watertown undertook to provide such insurance and to contribute to the premiums at the required level of 50%, the balance being furnished by employees through deduction from their wages (or, if no wages were forthcoming for the period in question, by direct payment to the employer). In 1968 a new § 7A was added to c. 32B, authorizing municipalities accepting that section to take action to provide an additional rate supplementing the 50% contribution. Under § 7A as it read

---

sponding to art. XV of the contract) and read as follows:
*"Insurance*

. . . .
"The present Group Insurance Plan, including Master Medical Coverage, shall remain in full force and effect for the term of this Agreement; the Employer shall continue to pay fifty percent (50%) of the premium cost thereof for each employee. Effective July 1, 1977, the Employer's contribution shall be supplemented by an annual lump sum payment (monthly or otherwise as determined by the Town) equal to the difference between fifty percent (50%) and seventy five percent (75%) of said premium during the particular year. In the event that the Town should increase its percentage of premium cost above fifty percent (50%), payments under the preceding sentence shall not duplicate any such increase."

376 Mass. 706                                               711

Watertown Firefighters, Local 1347, I.A.F.F., AFL-CIO *v.* Watertown.

until 1973, the possibility was not expressly foreclosed
that the town might undertake to contribute at a higher
rate for one employee-group, say firefighters or police
officers, than for another, say school teachers. This might
occur in fulfilment of differing collective agreements
with various employee-groups. See *Brooks* v. *School
Comm. of Gloucester*, 5 Mass. App. Ct. 158 (1977). But that
possibility was ruled out through the enactment in 1973
(St. 1973, c. 789, § 1) of an addendum to § 7A (first para-
graph) as follows: "No governmental unit, however, shall
provide different subsidiary or additional rates to any
group or class within that unit." See *Broderick* v. *Mayor
of Boston*, 375 Mass. 98 (1978) (Boston ordered to equalize
contributions among its employees as required by the
1973 amendment of § 7A).

The reasons for the 1973 amendment can be readily
discerned. A single rate of deduction for all employees of
a municipality, joined with a single rate of contribution
by the municipality, presents a simpler and hence a less
expensive picture for practical management than the
fragmented structure that would result from rates vary-
ing among the several employee-groups. The more signifi-
cant consideration, however, is the inexpedience (as a
Legislature could view it) of encouraging a competitive
scramble in collective bargaining among employee-
groups to procure increased municipal contributions to
the insurance premiums. This could well lead in the end
to a drive for a system to allow bargaining as to the kinds
of casualties to be covered. Besides setting up a pressure
from contract to contract to escalate the municipal con-
tributions, the process described might result in serious
impairment of the basic advantages of the group insur-
ance program which derive from wide distribution of
risks and uniform administration. We may note that the
foregoing view of the purposes of the 1973 amendment is
confirmed by statements of the Group Insurance Com-
mission[10] when that amendment was being offered for

---

[10] Established in 1955, the Commission has had varying responsibili-
ties regarding group insurance for government employees. For its

enactment, and again in 1974 when there was an abortive effort to repeal the amendment and allow increases of municipal contributions for the benefit particularly of firefighters and police officers or (in another version) for any chosen employee-group.[11]

Thus we see that the insurance provision of the union's offer, embodied in the award, offended against the statutory scheme (rendered exclusive by G. L. c. 32B, § 15[12]). The town would be required to make an increased contribution, although it had not legislated the increase, and indeed had expressed itself legislatively against it. Moreover, the town would be put in the position of singling out one employee-group for special treatment as to premium contributions when the controlling statute required that all town employees under group insurance be dealt with alike.

The arbitration panel sought to defend the insurance provision as a "salary supplement" justified by a special health hazard,[13] analogous to a "night differential" that

---

present status, see G. L. c. 32A, §§ 3, 4; G. L. c. 32B, §§ 3, 11. See also *Brooks* v. *School Comm. of Gloucester*, 5 Mass. App. Ct. 158, 161-162 n.5 (1977).

[11] According to the Commission, varying contributions by a municipal unit would be "discriminatory and create unnecessary friction between employees"; group insurance "should not be fragmented into smaller elements of special interests." (Statement of March 20, 1973, on House No. 5656.) Repeal of the 1973 amendment "may be foreseen as a forerunner of an attempt to fragmentize the level of coverage itself," all contrary to the principle that "the broader the spread of risk, . . . the lower the total premium cost." (Statements of March 26, 1974, on House Nos. 1421 and 1414.)

These statements are referred to in the *Brooks* case, cited earlier in the text, and are mentioned here not as necessarily proving the legislative intent with respect to the 1973 amendment, but as confirming a common sense interpretation of the amendment.

[12] Section 15 prohibits any governmental unit from appropriating or expending public funds for the group insurance unless the insurance is procured pursuant to the provisions of c. 32B (with an exception not relevant here).

[13] It may be noted that if firefighters are assumed to have more serious health hazards, they are already somewhat favored by being

might be granted to compensate for peculiar characteristics of a job. The panel also suggested that the employees would be subject to tax on the 25% payment they would receive which they might spend for other purposes.[14] However, as indicated in our narrative, in fact salaries were considered on their merits during the hearings; the question of insurance was an issue apart. The proposed contract provision was labeled "Insurance." The 25% added payment was denominated a supplemental contribution to be made by the town, and as such was to be reduced or to cease altogether if the town should later make an increased contribution to the premiums by the prescribed method of voting it across the board. The trouble with the supposed analogy to a "night differential" is that in the present case there is a statutory prohibition on the particular differential involved unless contributed in accordance with the statute. The possibility that the transaction would not be held a mere form for tax purposes hardly avoids a collision with the statutory bar. We are brought to the conclusion that pro tanto the arbitration was here "used as a method of evading a well defined statutory policy."[15]

---

brought into group insurance on an equal basis with others sustaining only ordinary hazards.

[14] Under G. L. c. 32B, § 11A, employees individually may purchase additional insurance, but it is noteworthy that municipalities are forbidden to contribute to this: "[T]he governmental unit shall make no contribution to said premium."

[15] The words are quoted from *Kerrigan* v. *Boston*, 361 Mass. 24, 31 n.3 (1972). In that case, as part of a collective agreement, a trust was set up for the benefit of city teachers, and Boston undertook to pay a certain sum per teacher into the fund in the years 1968 and 1969. A proposal by the trustees to use part of the money to purchase group accidental death insurance additional to that provided in accordance with c. 32B was held by the trial judge to be offensive to § 15, see note 12, *supra*. The point was not reached on appeal, but we remarked (*id.*): "Thus we need not consider on this record the problems which may arise if a collective bargaining agreement is used as a method of evading a well defined statutory policy. Such problems may properly

This case exemplifies a well understood principle—that mere characterization of a feature of a collective bargain or an arbitration award as "compensation," or "terms or conditions of employment" or some other subject conventionally or by law within the scope of either process, will not save the provision if in substance it defeats a declared legislative purpose.[16] A case rather close on its facts to the present is the *Washington Arbitration Case*, 436 Pa. 168 (1969), where an award in ordinary interest arbitration (not confining the arbitrators to the offers of the parties) would have required a city to make premium payments for group insurance covering the families of its police officers in addition to the officers themselves. There was statutory authorization for city contributions to group insurance for its employees. To justify the award the police officers pointed to the law legalizing collective bargaining "concerning the terms and conditions of their employment, including compensation, hours, working conditions, retirement, pensions and other benefits." *Id.* at 175. Despite this broad language and the fact that the statute on group insurance did not (as does ours) in terms forbid the questioned municipal contribution,[17] the court struck the pertinent part of the award for violation of the perceived policy of the statute, which was not to be circumvented by calling the contribution an addition to salary, or compensation, or benefits: "[A]rbitration panels . . . may not mandate that a governing body carry out an illegal act." *Id.* at 176. This rationale has been followed in a line of cases.[18]

be left for a case where the record and arguments adequately present the issue sought to be raised."

[16] Contrast G. L. c. 150E, § 7, which states that the terms of a collective bargaining agreement may supersede the provisions of certain State statutes there enumerated.

[17] In fact the Pennsylvania court said "the legislative policy precluding the payment of premiums such as those involved in this case may be weak indeed," in light of two recent statutes "demonstrat[ing] the absence of a clear legislative policy favoring the proscription." *Id.* at 178.

[18] See *Local 1400, Chester City Fire Fighters Ass'n v. Nacrelli*, 30 Pa. Commw. Ct. 242 (1977) (credit for periods of nonemployment); *Hart-*

On similar or analogous reasoning we have held, by reference to the legislation vesting certain powers in school committees (see G. L. c. 71, § 37) and the common understanding of that legislation, that collective bargaining cannot reach out to control by agreement subjects "predominantly within the realm of educational management" (*Bradley* v. *School Comm. of Boston,* 373 Mass. 53, 56 [1977]), even when those subjects or the purported agreements about them have some relation to wages or employment or working conditions.[19] Thus in *School Comm. of Hanover* v. *Curry,* 369 Mass. 683 (1976), we vacated an arbitral award, after grievance procedure, requiring a school committee to undo its unilateral abolition of a supervisory position: "[I]t was beyond the power of the committee to bind itself to that result or to delegate to an arbitrator the power so to bind the committee. The arbitrator therefore exceeded his powers.... 'Public policy, whether derived from, and whether explicit or implicit in statute or decisional law, or in neither, may ... restrict the freedom to arbitrate.... Key to the analysis is that the freedom to contract in exclusively private enterprises or matters does not blanket public school matters because of the governmental interests and public

---

*shorn* v. *Allegheny County,* 9 Pa. Commw. Ct. 132 (1973) (control and assignment of detectives); *Cheltenham* v. *Cheltenham Police Dep't,* 8 Pa. Commw. Ct. 360 (1973) (eligibility for retirement at age fifty-three); *Allegheny County Firefighters, Local 1038* v. *Allegheny County,* 7 Pa. Commw. Ct. 81 (1973) (union membership requirements). Cf. *Fraternal Order of Police* v. *Scranton,* 26 Pa. Commw. Ct. 513 (1976) (upholding additional compensation for educational degrees); *Reading* v. *Reading Lodge Fraternal Order of Police No. 9,* 15 Pa. Commw. Ct. 344 (1974) (permitting pension benefits before age of fifty).

[19] The statutory regulation of group insurance for municipal employees does not exclude all collective bargaining by a union on the subject, but any proposal for a municipal contribution over 50% must envisage an increase for all employees, and this would "tend to make bargaining on that issue atypical and more difficult." *Brooks* v. *School Comm. of Gloucester,* 5 Mass. App. Ct. 158, 160-161 n.4.

concerns which may be involved, however rarely that may ever be.' " *Id.* at 685, quoting from *Susquehanna Valley Cent. School Dist.* v. *Susquehanna Valley Teachers' Ass'n*, 37 N.Y.2d 614, 616-617 (1975). And see *Berkshire Hills Regional School Dist. Comm.* v. *Berkshire Hills Educ. Ass'n*, 375 Mass. 522 (1978); *School Comm. of W. Springfield* v. *Korbut*, 373 Mass. 788 (1977); *Boston Teachers Local 66* v. *School Comm. of Boston*, 370 Mass. 455 (1976); *School Comm. of Braintree* v. *Raymond*, 369 Mass. 686 (1976). From *School Comm. of Boston* v. *Boston Teachers Local 66*, 372 Mass. 605 (1977), it appears that like ideas are at work to limit interest arbitration.[20]

We turn to a minor point. Besides the insurance provision of the union's offer, the town objects to a clause about longevity pay. There is no merit in the latter contention.[21]

2. *Modification of the award.* As the part of the arbitration award corresponding to the insurance provision of the union's offer cannot stand, we have the question whether the rest of the award should be enforced. The town argues that, as part of the union's offer was invalid, the union's entire "package" is disqualified and the town's offer becomes the only one in the field and must be approved. On the other hand, the union has indicated that in case of partial invalidity it would rather start all over again before the arbitrators than secure enforce-

---

[20] See also *Kenai Peninsula Borough School Dist.* v. *Kenai Peninsula Educ. Ass'n*, 572 P.2d 416, 422-423 (Alas. 1977); *Biddeford* v. *Biddeford Teachers Ass'n*, 304 A.2d 387 (Me. 1973); *West Irondequoit Teachers Ass'n* v. *Helsby*, 35 N.Y.2d 46 (1974); Annot., 68 A.L.R.3d 885, 915-920, 922-926, 932-933 (1976).

[21] The longevity provision rearranged the time for those payments. The town invokes G. L. c. 41, § 56, which requires that approval of municipal expenditures be given "after an examination to determine that ... services were actually rendered," and claims that it forbids "prepayments." We need not pass on this reading of the statute, as the longevity pay on the revised schedule appears still to relate to services rendered in previous periods. Nor is any "gratuity" involved. See *Fitchburg Teachers Ass'n* v. *School Comm. of Fitchburg*, 360 Mass. 105 (1971).

376 Mass. 706                                          717

Watertown Firefighters, Local 1347, I.A.F.F., AFL-CIO v. Watertown.

ment of the valid remainder. We dealt with some aspects of this general problem in *Marlborough Firefighters, supra*, also a case of partial invalidity of an award in a last and best offer arbitration. The question has its peculiar aspects because in this form of arbitration an offer is finally approved in solido. Neverthless in *Marlborough* we severed the invalid part of the award and enforced the rest, having concluded, as had the trial judge, that that would not do an injustice (375 Mass. at 593): the part rejected had been separately considered by the arbitrators; the arbitrators would surely have approved the offer, had it been so reduced in the first place; and no practical difficulty of managing the modified award could result. These factors exist in our case as well. The discarded part in *Marlborough* was probably less important, relatively, than it is in the present case, and there the union, which had won the award, was quite willing to accept it as truncated, while here the union is not so willing. But we attach weight to the circumstance that here the union was made aware of the chance that its insurance proposal would be held invalid, and yet persisted in including it in its offer. On the whole we believe severance is justified and advisable.

3. *Interest on the award.* The question of the running of interest on a last and best offer award was raised in *Marlborough Firefighters* but, while indicating a leaning toward allowing interest from the date of the award, we did not have to decide the matter. See 375 Mass. at 601 n.7. We now hold that such should be the general rule for arbitrations of this kind, for the award fixes definite or ascertainable dollar amounts and is by the statute declared presumptively "binding upon the parties" when made.[22] The rule commends itself also because it encour-

---

[22] The statute, St. 1973, c. 1078, § 4, stated: "Any determination or decision of the arbitration panel if supported by material and substantive evidence on the whole record shall be binding upon the parties and may be enforced at the instance of either party or of the arbitration panel in the superior court in equity; . . ." Cf. *Local 494 IBEW* v.

ages swift obedience by the parties to the award.[23] A possible contention was considered in the *Marlborough* case that interest should start when the action to enforce is commenced, because the adversary has no means of precipitating a contest and must await an enforcement action and defend against it.[24] We reserve opinion as to whether the adversary is necessarily deprived of initiative, but, for the reasons mentioned, our decision would be the same if the adversary were so deprived. At the same time, we think the general rule may bend in particular cases to equitable considerations.[25] We add that we see no reason why a party's offer could not itself pro-

---

*Artkraft, Inc.*, 375 F. Supp. 129, 132 (E.D. Wis. 1974); *Meat & Allied Food Workers Local 248* v. *Packerland Packing Co.*, 411 F. Supp. 1280, 1284 (E.D. Wis. 1976); *Hackman* v. *American Mut. Liab. Ins. Co.*, 110 N.H. 87, 94-95 (1970).

In *Glenn Acres, Inc.* v. *Cliffwood Corp.*, 353 Mass. 150, 156 (1967), referred to by the town on this appeal, the court stressed that the "finality" of the commercial arbitration award involved there was "subject to and dependent upon" the entry of a judgment. Prior to such judgment, the award was to be treated as an unliquidated contract claim on which interest would run from the date of the writ (the initiation of the action to confirm). The remarks about lack of finality of the award appear not to fit the situation of a best and last offer award. See also *Marlborough Firefighters, Local 1714* v. *Marlborough*, 375 Mass. 593, 601 n.7 (1978).

[23] See *Lundgren* v. *Freeman*, 307 F.2d 104, 112 (9th Cir. 1962) ("It should be the rule, rather than the exception, that when arbitrators hand down an award the parties will comply with it, without the necessity of court proceedings").

[24] This suggestion was grounded on the statutory text quoted at note 22, *supra*.

[25] Cf. *Board of County Comm'rs* v. *United States*, 308 U.S. 343, 352 (1939) (Frankfurter, J.) ("[I]nterest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable"); *NF&M Corp.* v. *United Steelworkers of America*, 390 F. Supp. 266, 270 (W.D. Pa.), aff'd, 524 F.2d 756 (3d Cir. 1975) (interest on arbitrator's back pay award denied in part because of union's repeated requests for delay).

pose a disposition of the question of interest which would control if the offer became the award.[26]

An adjustment of interest will be required because of the falling out of the insurance provision (the general rule will apply to the remainder despite this modification of the award). The town (assuming, as we hold, that the judge applied the correct rule) asserts that there was a lack of evidence to support the particular computation made; the union says the town waived any right to a hearing on the computation. We are unable to resolve this quarrel on the basis of the present record and think it should be reexamined below.

To sum up: The judgment enforcing the arbitration award should be affirmed except as to the insurance provision, and as to that provision should be reversed. The case is remanded to the Superior Court Department (a) for an adjustment of interest to reflect the reversal, and (b) for reconsideration of the computation of the balance of the interest adjudged if the court should find that course justified.

*So ordered.*

---

[26] It is now in order to say that the ruling on interest made in *Arlington* v. *Local 1297, I.A.F.F.*, 6 Mass. App. Ct. 874 (1978), appears not in accord with the general rule we have stated.