CITY OF TAUNTON vs. TAUNTON BRANCH OF THE
MASSACHUSETTS POLICE ASSOCIATION.

Bristol. November 15, 1979. — July 11, 1980.

Present: BROWN, GREANEY, & DREBEN, JJ.

*Municipal Corporations*, Collective bargaining. *Police. Labor*, Collective bargaining. *Arbitration*.

An arbitration panel conducting last and best offer arbitration pursuant to St. 1973, c. 1078, § 4, exceeded its authority in including in its award three provisions from a predecessor collective bargaining agreement which set forth the procedure to be followed by the city when involuntarily transferring a police officer from one shift to another, prohibited the rotation of shifts, and provided that all assignments on each shift be filled by regular officers, all of which were matters of managerial policy excluded from the scope of arbitration by § 4. [241-245]

It was within the scope of authority of an arbitration panel conducting last and best offer arbitration pursuant to St. 1973, c. 1078, § 4, to include in its award an increase in the city's share of the premiums for medical and group life insurance coverage. [245]

Where an arbitration panel conducting last and best offer arbitration pursuant to St. 1973, c. 1078, § 4, exceeded its authority with respect to portions of its award, the invalid portions were severed and the valid portion enforced. [245]

CIVIL ACTION commenced in the Superior Court on September 29, 1977.

The case was heard by *McGuire*, J., on a motion for summary judgment.

*Mark G. Kaplan (Richard L. Alfred* with him) for the defendant.

*Ellen C. Kearns* for the plaintiff.

BROWN, J. Negotiations between the city of Taunton (city) and the Taunton Branch of the Massachusetts Police Association (association), the collective bargaining representa-

tive of the city's police officers, failed to produce a collective bargaining agreement for the period commencing on July 1, 1976. On July 26, 1976, the Board of Conciliation and Arbitration (board) appointed a "fact finder" to resolve the impasse. G. L. c. 150E, § 9, inserted by St. 1973, c. 1078, § 2. On December 10, 1976, the fact finder made findings and recommendations. When these failed to resolve the impasse, the association, pursuant to St. 1973, c. 1078, § 4,[1] petitioned the board to investigate. The board's investigation led to the appointment of a three-member arbitration panel to conduct "last and best offer" arbitration.

After hearings before the panel, the city and the association submitted written statements of their last and best offers on May 27, 1977. Only three issues still separated the two sides: (1) the city's share of the premiums for the police officers' Blue Cross-Blue Shield and group life insurance coverage, (2) the hourly rate of pay for police officers serving on "extra paid details" at polling places, and (3) certain questions concerning the police chief's power to assign officers to shifts. The association, in its last, best offer, pressed its demand that the city's share of the Blue Cross-Blue Shield and group life insurance premium be increased from the fifty percent provided for in the previous collective bargaining agreement to seventy-five percent, but the association withdrew its earlier demand that the hourly rate for polling place duty be increased from $4.00 to $8.00. On the matter of shift assignments, the association continued to seek inclusion in the collective bargaining agreement of three provisions from the predecessor agreement which the city maintained conflicted with its management prerogatives. These provisions were Article VIII, § 1, of the predecessor agreement setting forth the procedure to be followed by the city when involuntarily

---

[1]In 1977 St. 1973, c. 1078, § 4, was amended by St. 1977, c. 347, § 2, effective June 27, 1977. Since the proceedings here in question were in progress on that date they are governed by St. 1973, c. 1078, § 4, as in effect prior to St. 1977, c. 347, § 2. See St. 1973, c. 1078, § 8.

transferring a police officer from one shift to another,[2] Article VIII, § 2, prohibiting the rotation of shifts,[3] and Article IX, § 3, as amended during the life of the predecessor agreement, providing that all assignments on each shift be filled by regular officers.[4]

The city in its last, best offer refused to pay any more than fifty percent of the Blue Cross-Blue Shield and life insurance premium in effect on July 1, 1976, but it did agree to pay sixty percent of any increase in the premium taking effect after that date. The city was also willing to pay $6.00 an hour and time and one-half after eight hours to police officers on polling place duty. On the matter of shift assign-

---

[2] Article VIII, § 1, reads: "No officer covered by this Agreement shall be involuntarily assigned to a relief other than that to which he is assigned on the effective date hereof unless the Chief first notifies the officer in writing at least two weeks in advance of his intention to assign the officer to another relief. A copy of the said notification shall be sent to the Association and to the City Council. The officer involved shall be given one week within which to protest the contemplated change of assignments. If the officer protests within one week, he shall not be transferred until a hearing has been held before the City Council in which the Chief shall state his reasons for desiring to make the transfer and the police officer shall state his reasons for opposing it. The City Council shall not approve any such transfer unless the Chief is able to demonstrate that the transfer is for good cause unconnected with discipline or Association activities. If the City Council approves the transfer and the officer involved and the Association still oppose it, the matter shall be submitted to arbitration pursuant to Step 4 of Article XXVII and the Arbitrator shall uphold the transfer only if the Chief is able to demonstrate that it was for good cause unconnected with discipline or Association activities."

[3] Article VIII, § 2, reads: "There shall be no rotation of reliefs."

[4] Article IX, § 3, as amended, reads: "All assignments on each relief, except officers who are assigned to special duty (the payroll officer), the meter repair officer and the safety officer, shall be filled by a regular officer. If no regular officer is available, then it shall be filled by a reserve officer. Officers assigned to special duty (the payroll officer), the meter repair officer and the safety officer shall not, as part of their scheduled assignment while on duty in those capacities, cover any other assignment on that relief." In light of an "interim ruling" on the scope of arbitration by the panel, the association modified its offer by withdrawing its insistence on including in the new collective bargaining agreement the last sentence of Article IX, § 3, as amended.

ments, the city contended that Article VIII, §§ 1 & 2, and Article IX, § 3, concerned matters outside the jurisdiction of the arbitration panel as defined in St. 1973, c. 1078, § 4,[5] and that as a result the association's entire offer, even as modified, was invalid and the panel must choose the city's.

On September 1, 1977, a majority of the panel chose the association's offer, as modified (see note 4, *supra*). "This under the law became the award, 'final and binding upon the parties and upon the appropriate legislative body.'" *Marlborough Firefighters, Local 1714* v. *Marlborough*, 375 Mass. 593, 594 (1978).

The city filed in the Superior Court a "petition to vacate opinion and award of arbitration panel." The association by counterclaim sought enforcement of the arbitration panel's decision pursuant to the eighth paragraph of St. 1973, c. 1078, § 4.[6] The association moved for summary judgment. Mass.R.Civ.P. 56(a), 365 Mass. 824 (1974). The judge, in a "memorandum of decision,"[7] ruled that although Article VIII, § 2, and the material portion of Article IX, § 3 (see note 4, *supra*) concerned matters within the scope of arbitration, Article VIII, § 1, dealing with the procedure by which the chief could involuntarily transfer officers from one shift to another concerned a matter outside the scope of arbitration as defined in St. 1973, c. 1078, § 4. The judge refused to sever the invalid portion of the award and ruled that the entire award must be denied enforcement. The judge also ruled that the portion of the award relating to insurance premiums was supported by material and substantive evidence. Judgment was entered deciding that the award "with respect to the City's health insurance contribu-

---

[5] The pertinent language of St. 1973, c. 1078, § 4, reads: "[T]he scope of arbitration in police matters shall be limited to wages, hours and conditions of employment and shall not include the following matters of inherent managerial policy: the right to appoint, promote, assign and transfer employees."

[6] See *Arlington* v. *Board of Conciliation & Arbitration*, 370 Mass. 769, 776 (1976).

[7] Filed subsequent to the entry of judgment.

tion was supported by material and substantive evidence" but that the award of the panel "exceeded its jurisdiction under [St. 1973, c. 1078, § 4] for which reason, the defendant's counterclaim for Enforcement is denied, and the City's Petition to vacate is allowed." The association appeals.

1. The association attacks the judge's ruling that Article VIII, § 1, concerned a matter outside the scope of the arbitration panel's authority. The city, on the other hand, not only supports the judge's ruling concerning Article VIII, § 1; it also attacks the judge's ruling that Article VIII, § 2, and Article IX, § 3, concerned matters within the scope of the arbitration panel's authority.[8] This is the first case squarely presenting for decision issues concerning the scope of the authority of an arbitration panel conducting last and best offer arbitration pursuant to St. 1973, c. 1078, § 4, which has come before either the Appeals Court or the Supreme Judicial Court. See *School Comm. of Boston* v. *Boston Teachers Local 66,* 372 Mass. 605, 613 (1977), containing dictum concerning this issue, and *Marlborough Firefighters, Local 1714* v. *Marlborough,* 375 Mass. at 595-596. Our analysis begins with a discussion of the context within which St. 1973, c. 1078, § 4, was enacted.

Statute 1973, c. 1078, brought about a wholesale revision of the Commonwealth's statutes concerning public employee collective bargaining. Sections 1 and 2 of c. 1078 repealed G. L. c. 149, §§ 178D & 178F-178N, and inserted c. 150E into the General Laws. Section 6 of G. L. c. 150E, as so inserted, requires public employers to negotiate with their employees (including policemen) "with respect to wages, hours, standards of productivity and performance, and any other terms and conditions of employment." Obviously many questions concerning a city's assignment of its police to shifts fall within some of those categories, particu-

---

[8] This contention is open to the city in spite of its failure to appeal from the judgment. The question whether an arbitration panel acted in excess of the authority conferred upon it "is always open for judicial review." *School Comm. of West Springfield* v. *Korbut,* 374 Mass. 788, 792 (1977).

larly "hours" and "conditions of employment." Indeed in *Labor Relations Commn.* v. *Natick,* 369 Mass. 431, 437-438, 442 (1976), the Supreme Judicial Court decided that certain regulations concerning work schedules and shifts issued pursuant to G. L. c. 41, § 97A, by a "strong" police chief were mandatory subjects of bargaining under c. 150E, § 6.[9] See also *Chief of Police of Westford* v. *Westford,* 365 Mass. 526, 531 (1974), involving the regulations of a "weak" police chief issued pursuant to G. L. c. 41, § 97. Although we need not decide the question, it may well be that G. L. c. 150E, § 6, required the city and the association to bargain collectively concerning Article VIII, §§ 1 & 2, and Article IX, § 3. However, even if this is so, it does not follow that the issue of whether those provisions should be included in the collective bargaining agreement was within the scope of the authority of the arbitration panel.

Unlike G. L. c. 150E, § 6, setting forth the mandatory subjects of collective bargaining, St. 1973, c. 1078, § 4, not only limits the scope of the arbitration panel's authority to "wages, hours and conditions of employment"; it also specifically states that the scope of arbitration in police matters "shall not include the following matters of inherent managerial policy: the right to appoint, promote, *assign* and *transfer* employees [emphasis supplied]." In this regard, it is significant that an effort to amend the bill which ultimately emerged from the legislature as St. 1973, c. 1078, so as to include a similar managerial rights clause in G. L. c. 150E, § 6, died after reference to Senate Ways and Means Committee. See 1973 Senate Journal 2329, 2368, 2382, 2403.

This refusal to include in the scope of the arbitration panel's authority all the subjects made bargainable by G. L. c. 150E, § 6, undoubtedly resulted from "an understand-

---

[9] It is appropriate at this point to observe that the record before us does not indicate whether the city has accepted either G. L. c. 41, § 97 or § 97A. See *Thibeault* v. *Chief of Police of Fitchburg,* 5 Mass. App. Ct. 360, 362 n.4 (1977).

able attitude of wariness about arbitration forced on a party." *School Comm. of Boston* v. *Boston Teachers Local 66,* 372 Mass. 605, 613 (1977). When a city or town is simply required to bargain collectively concerning a subject, the ultimate decision whether to accept a particular proposal of a union remains with the city or town. Thus, in *Chief of Police of Westford* v. *Westford,* the Supreme Judicial Court could observe, "While some may believe that the proper organization and operation of a police department require more flexibility than . . . [the collective bargaining agreement] permit[s], that is apparently not the opinion of the selectmen. And it is to the selectmen that the Legislature has committed that decision." 365 Mass. at 532. However, when an impasse is resolved by last and best offer arbitration the ultimate decision whether to accept a proposal of a union is made by the arbitration panel and not by the city or town.

A police chief's authority to assign his officers to particular duties is a matter that concerns the public safety. *Chief of Police of Dracut* v. *Dracut,* 357 Mass. 492, 502 (1970). We think that the Legislature, by including a managerial rights clause in St. 1973, c. 1078, § 4, clearly recognized as we have said in another context, that "[p]ublic safety must be left to the appropriate officials and to the political process which affects public policy." *Boston* v. *Boston Police Patrolmen's Assn.,* 8 Mass. App. Ct. 220, 226 (1979). In short, although the Legislature, by enacting G. L. c. 150E, intended to require the *city* to bargain collectively concerning the chief's authority to assign his officers, contrary to the decision of the Supreme Judicial Court in *Chief of Police of Dracut* v. *Dracut,* 357 Mass. at 502 (see *Labor Relations Commn.* v. *Natick,* 369 Mass. at 442), the Legislature did not intend to empower *the arbitration panel* in making its award to deprive the chief of his authority to "exercise his own discretion and judgment as to the number, qualifications and identity of officers needed for particular situations at any given time." 357 Mass. at 502.

We think that it was beyond the authority of the arbitration panel to include the three articles involved in the pres-

ent case in its award. While the city could agree to these provisions as it had in the previous agreements it was not required to do so. See *Bradley* v. *School Comm. of Boston*, 373 Mass. 53, 60 (1977). The city could well view such provisions as placing overly inflexible or cumbersome restrictions upon the chief's ability to assign his men to job duties. See *Chief of Police of Dracut* v. *Dracut*, 357 Mass. at 501-502. None of the articles provides for exceptions when public safety may be increased thereby. For example, suppose a reserve officer had special experience in a problem which a particular detail was likely to face over a limited period of time and the chief deemed that that experience made him uniquely qualified to serve on that detail for that period of time. Article IX, § 3, would prevent the chief from assigning the reserve officer to the detail in preference over a regular officer. See *Boston* v. *Boston Police Superior Officers Fedn.*, 9 Mass. App. Ct. 898 (1980).

As observed by the judge, Article VIII, § 1, raises the particular problem that it attempts to prohibit transfers for disciplinary reasons. We agree with him that the fact that St. 1977, c. 347, added to St. 1973, c. 1078, § 4, a managerial rights clause applicable to firefighters specifically providing that in firefighter matters "disciplinary and punitive transfers shall be within the scope of arbitration" but did not change the languge of the managerial rights clause applicable in police matters indicates an intent that disciplinary and punitive transfers not be within the scope of arbitration in police matters.

We conclude that that portion of the arbitration panel's award which provided that Article VIII, §§ 1 & 2, and Article IX, § 3, be included in the new collective bargaining agreement was invalid. This is not to say that it was beyond the scope of the panel's authority to include in its award any language dealing with the matters those articles concern. Less inflexible language providing for exceptions in the interests of public safety might be permissible. As we have said on another occasion, government management cannot "hide behind a curtain of public safety; what constitutes a

legitimate 'public safety' exclusion from arbitration will have to be decided on a case by case basis." *Boston* v. *Boston Police Patrolmen's Assn.*, 8 Mass. App. Ct. at 226.

2. The city contends that that portion of the award dealing with health insurance is beyond the scope of the arbitration panel's authority. This contention is without merit. The city's brief implicitly concedes that the city accepted G. L. c. 32B, § 7A, thereby giving it authority to contribute more than fifty percent of the premium. See *School Comm. of Medford* v. *Labor Relations Commn.*, 8 Mass. App. Ct. 139, 140-142 (1979), *S.C.*, 380 Mass. 932 (1980). Contrast *Watertown Firefighters, Local 1347* v. *Watertown*, 376 Mass. 706, 710-716 (1978); *School Comm. of Holyoke* v. *Duprey*, 8 Mass. App. Ct. 58, 62-66 (1979). Not having appealed from the judgment, which specifically declared that the portion of the award dealing with health insurance was supported by material and substantive evidence, the city cannot now contend that that portion of the award was not so supported. Contrast note 8, *supra*.

3. The only remaining question is whether, because of the partial invalidity of the award as discussed in part 1 of this opinion, the entire award must be denied enforcement or whether the invalid portion of the award can be severed from the valid portion, and the valid portion enforced. We think it clear, in light of the fact that the arbitration panel in its award indicated its intent that the award "be deemed severable so that only the contract provisions which exceed the panel's statutory powers should be deleted and the remainder . . . be allowed to stand," and in light of the Supreme Judicial Court's decisions in *Marlborough Firefighters, Local 1714* v. *Marlborough*, 375 Mass. at 596-600, and *Watertown Firefighters, Local 1347* v. *Watertown*, 376 Mass. 706, 716-717 (1978), that the valid portion of the award should be enforced.

The judgment is reversed and a new judgment is to enter consistent with this opinion.

*So ordered.*