SCHOOL COMMITTEE OF BOSTON & others[1] *vs.* BOSTON
TEACHERS UNION, LOCAL 66, AMERICAN FEDERATION
OF TEACHERS (AFL-CIO)[2]
(and a companion case[3]).

Suffolk.    January 4, 1977. — May 25, 1977.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & LIACOS, JJ.

*Boston. School and School Committee. Arbitration. Labor. Contract,* Collective bargaining contract. *Municipal Corporations,* Collective bargaining.

Voluntary interest arbitration under G. L. c. 150E, § 9, fifth paragraph, to establish the terms of a new collective bargaining agreement was not limited to items within the scope of mandatory bargaining. [611-613]
Certain items in a collective bargaining agreement which were submitted for voluntary interest arbitration under G. L. c. 150E, § 9, fifth paragraph, were not so central to educational policy as to preclude their voluntary submission to an arbitrator. [613-616]

CIVIL ACTION commenced in the Superior Court on September 25, 1975.

The case was heard by *Lynch, J.*

The Supreme Judicial Court granted a request for direct appellate review.

*Michael J. Betcher,* Assistant Corporation Counsel (*Kevin F. Moloney,* Assistant Corporation Counsel, with him) for the School Committee of Boston & others.

*Albert L. Goldman (John F. McMahon* with him) for the Boston Teachers Union, Local 66, American Federation of Teachers (AFL-CIO).

KAPLAN, J.    After extended efforts, the School Committee of Boston and the Boston Teachers Union found

---

[1] City of Boston and mayor of Boston.

[2] Through its president and executive vice-president as representative parties.

[3] In the companion case the parties are reversed.

themselves unable to resolve their differences in negotiating collective bargaining agreements for the school year 1974-1975. Accordingly, they agreed to submit the outstanding items to "interest" arbitration under G. L. c. 150E, § 9, fifth paragraph.[4] Following lengthy hearings, the arbitrator made his award on these items. Thereupon the School Committee (and the city of Boston and its mayor) commenced an action against the Teachers Union to vacate the award as to certain items, the contention being that these were beyond the arbitrator's authority even though within the scope of the agreed submission. The Teachers Union brought a cross action to confirm the award. A judge of the Superior Court held in favor of the Teachers Union. We granted direct appellate review of these matters and also of a related matter involving a question of civil contempt. All were consolidated for purposes of argument. Reserving the contempt question to a separate opinion, filed this day, we affirm the judgment upholding the award.

1. To state the facts in more detail: With two collective bargaining agreements due to expire on August 31, 1974 (one covered teachers and nurses, the other teachers' aides), the parties began to negotiate for successor contracts in March, 1974, and met on occasions through August. Unable to settle some one hundred issues, the parties on August 28, 1974, entered into a "Memorandum of Agreement" providing, first, that all but one of the terms of the 1973-1974 contracts should continue in effect until modified by arbitration,[5] and, second, that "the Committee and the Union will submit all outstanding items (including salary items) to prompt final and binding arbitration as to the terms of the successor collective bargain-

---

[4] As will be indicated below, "interest" arbitration involves the settlement of the terms of a contract between the parties, whereas, in the more familiar "grievance" arbitration, the subject is claimed violation or interpretation of the terms of an existing contract.

[5] The one change was a salary increase of 5½% effective from September 1, 1974.

ing agreements for teachers and nurses, and for aides and the terms of any 1973-1974 agreements shall be modified effective September 1, 1974 by the terms of such award." The Boston city council voted on September 16 to authorize an arbitration proceeding pursuant to the submission agreement.[6] Hearings before the arbitrator began on October 25, resulting in an "Interim Award" dated January 11, 1975, which denied the Teachers Union's cost-of-living proposal, but increased salaries by a certain percentage with effect as from September 1, 1974.[7] It may be noted here that the arbitration would have been cut short, had the School Committee held fast to a "final best offer" covering all the differences, worked out some days before disclosure of the interim award, which was evidently acceptable to the Teachers Union. When the School Committee receded from the offer on a material point, the arbitration went forward.[8]

Hearings continued to June 30, 1975, and on August 26 the arbitrator rendered a final award settling the terms of the 1974-1975 contracts. By the award the terms of the 1973-1974 agreements were continued except for twenty-eight items, comprising nine pages, which represented modifications of those agreements.

The municipal parties sued in the Superior Court on September 25, 1975, to vacate all or part of each such item, and the Teachers Union filed suit on October 10 to confirm the whole of the award (including the interim award). By agreement of the parties, however, the battleground was reduced to five items,[9] and an interlocutory

---

[6] The union membership had ratified the agreement some days after August 28.

[7] An additional increase of 4% to a total of 9½%.

[8] The difficulty arose on a question of the length of the work day. The School Committee sought to restrain the issuance of the interim award on the ground that the submission agreement did not authorize such piecemeal disposition. Relief was denied. No appeal was taken.

[9] On September 29, 1975, the parties concluded agreements for 1975-1976, effective from September 1, 1975. They agreed in this settlement to continue the terms of the 1973-1974 agreements as altered by the

order was issued confirming the rest of the award. The judgment here under review, entered after hearing, besides making final the interlocutory order, confirmed the five items, of which three remain for consideration, as the municipal parties do not argue the others.[10] Item 119 (so far as objected to) called for payment of severance pay found owing to persons who retired, resigned, or died before September 1, 1974. Item 120 (first paragraph) modified the terms of a "health and welfare" fund by changing the arrangement about who were to serve as trustees. Item 178 dealt with remedial reading for pupils with certain reading deficiencies and the provision of reading specialists for the programs. (These items will be described further under point 4 below.)

2. As to the statutory framework: G. L. c. 150E grants public employees organizational and bargaining rights (§ 2) with provision for determining exclusive bargaining representatives (§§ 3-4). Section 6 obligates the employer and the bargaining representative to meet at reasonable times (including meetings in advance of the employer's budget-making process) and to "negotiate in good faith with respect to wages, hours, standards of productivity and performance, and any other terms and conditions of employment, but such obligation shall not compel either party to agree to a proposal or make a concession."[11] If

---

arbitration award (subject to dispute only on the five items), with further modifications imported by provisions of the settlement. In regard to one of the items remaining in dispute — severance pay (see the reference to Item 119 in the text below) — the School Committee reserved the right not to make payment until after appeals were exhausted.

[10] There is no argument here with respect to Item 96, which places "guidance advisors" into salary "Group II" (thus increasing their pay), or Item 130, which provided that certain positions ("[a]ll rated positions filled on an acting basis") should be filled through the appropriate rating procedure within ninety days except in certain enumerated situations.

[11] This statement of the scope of collective bargaining differs from that contained in the former law, G. L. c. 149, § 178I (see St. 1965, c. 763, § 2). That law provided that the parties "shall confer in good faith with respect to wages, hours and other conditions of employment,"

agreement is reached, the employer submits to the relevant legislative body a request for any appropriation needed to make it effective (§ 7).

Section 9 describes what is to happen if agreement is not reached within a reasonable time. Either party may petition the State Board of Conciliation and Arbitration (see G. L. c. 23, § 7) "for a determination of the existence of an impasse," and if that is found, the board appoints (or the parties agree upon) a mediator to assist the parties in resolving the impasse. After a reasonable period, the mediator reports to the board. If the impasse continues, then, upon either party's petition, or on the petition of the parties acting jointly, the board appoints or the parties select a fact finder. He transmits his findings and recommendations to the board and the parties; if the impasse continues for ten days, the report is published; if the impasse continues thereafter, the issues are returned to the parties for further bargaining.

There is, however, a separate route, the one followed in the present case — "interest" arbitration. This depends on agreement of the parties and ends in a final and binding award. Section 9, fifth paragraph, provides:

"Any arbitration award in a proceeding voluntarily agreed to by the parties to resolve an impasse shall be binding on the parties and on the appropriate legislative body and made effective and enforceable pursuant to the provisions of ... [G. L. c. 150C], provided that said arbitration proceeding has been authorized by the appropriate legislative body or in the case of school employees, by the appropriate school committee."

And under c. 150C (which by its own terms governs grievance arbitration under the provisions of a private-sector collective bargaining agreement) we find provision for

an expression tracking the language of the Federal statute governing bargaining in the private sector, 29 U.S.C. § 158(d) (Supp. V 1975), and not far from our present statute governing bargaining in the private sector, G. L. c. 150A, §§ 4 (5), 5 (*a*) ("in respect to rates of pay, wages, hours of employment, or other conditions of employment").

enforcement by the court of the awards made in the arbitral proceedings (§§ 10-13). The grounds for vacating an award are set forth in § 11, and the one of interest to us is: "(3) the arbitrators exceeded their powers or rendered an award requiring a person to commit an act or engage in conduct prohibited by state or federal law."

3. On a superficial view, it seems that all things were done entitling the award, including the particular items of the award in question, to be confirmed without more. The parties, after long negotiation, had reached deadlock. They agreed in a formal writing to submit themselves to arbitration; the submission agreement was duly endorsed by the city council; and it is not disputed on this appeal that that agreement extended to the particular items. No objection is taken to the arbitrator's conduct of the hearings before him. There is no criticism of the award on these points as being beyond the bounds of reason.

The School Committee's principal contention on this appeal is that the award was beyond the arbitrator's authority because the whole arbitral process under G. L. c. 150E, § 9, fifth paragraph (quoted above), must be restricted to matters as to which the parties are obligated to negotiate in good faith under § 6 (also above quoted) and the items involved were not of that kind. Of course § 9, fifth paragraph, does not say this in terms. It is suggested, however, that the thought is conveyed by the word "impasse."

The courts have held under the National Labor Relations Act that a party violates his duty to bargain in good faith if he insists to the point of impasse on a matter as to which the statute does not impose a duty to bargain — a so called "nonmandatory" or "permissive" matter. This is the doctrine of *NLRB* v. *Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342 (1958), which has been endlessly elaborated in private-sector litigation.[12]

---

[12] See generally, C. Morris, The Developing Labor Law 379-439 (1971); Stewart & Engeman, Impasse, Collective Bargaining and Action, 39 U. Cin. L. Rev. 233 (1970); Comment, Subjects Included within Management's Duty to Bargain Collectively, 26 La. L. Rev. 630 (1966).

We shall assume that the subjects of the three items in the present case fall outside the scope of mandatory bargaining described in G. L. c. 150E, § 6. (The nature of these items is further considered at point 4 below.) Suppose *Borg-Warner* is read into § 9, fifth paragraph, so that an impasse under that provision must have arisen in connection with matters for mandatory bargaining. That was the situation at bar, for the list of outstanding items included many as to wages and so forth that were indubitably of the mandatory type. Such an impasse having arisen, the parties could voluntarily submit to arbitration not only those items but additional and different items in deadlock, and the arbitrator's authority extended to them. Analogically, when parties in fact include nonmandatory items in a collective bargaining agreement which contains an arbitration clause, disputes as to those items are subject to grievance arbitration with the rest, and awards regarding them are enforced without distinction from awards as to matters initially for mandatory bargaining. See *United Steelworkers* v. *Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599 (1960); *United Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-583 (1960); *NLRB* v. *Wooster Div. of Borg-Warner Corp.*, *supra* at 349. That is surely true, as well, of arbitration under our c. 150C, as § 1 indeed indicates expressly.[13] Of course there has never been any thought that interest arbitration by agreement between private parties must be limited to the mandatory subjects. See *Chattanooga Mailers Local 92* v. *Chattanooga News-Free Press Co.*, 524 F.2d 1305, 1314-1315 (6th Cir. 1975); *Winston-Salem Printing Pressmen & Assistants' Union No. 318* v. *Piedmont Publishing Co.*, 393 F.2d 221, 225-226 (4th Cir. 1968). The scope of voluntary interest arbitration in the public sector has its limits, as we shall see at point 4 below, but those cannot

---

[13] General Laws c. 150C, § 1, inserted by St. 1959, c. 546, § 1, refers to the arbitration of any controversy "including but not restricted to any controversy dealing with rates of pay, wages, hours or other terms and conditions of employment."

in reason be coterminous with the scope of mandatory bargaining.

As indicated, the draftsmen of § 9, fifth paragraph, omitted any words confining voluntary interest arbitration to the field of mandatory bargaining. That the arbitration should extend more broadly is the result to which the draftsmen would have been led by their practical good sense. Many labor contracts reached in the usual course include, quite naturally, a miscellany of provisions thrown up by experience which are not at the core of bargaining over wages, hours, and the like. As the record proves, such has been conspicuously the case in contracts over the years between the present parties. Being at a standstill on a variety of subjects, the parties would have thought it odd indeed if they had been told that their Memorandum of Agreement under § 9, fifth paragraph, which reflected the actual dimensions of irreconcilable dispute, was in part nugatory. On that view, it is extremely doubtful that they would have taken the step of submitting their quarrels to binding arbitration.

In a larger sense, it seems evident that if voluntary interest arbitration is to make an appeal to the parties and carry out its purpose of avoiding protracted strife, it must, optimally, imitate the range of the negotiation which it supersedes. The interplay and "tradeoff" of mandatory and other items which are described as "the very fabric of effective collective bargaining," *Oil Workers Int'l Local 3-89* v. *NLRB*, 405 F.2d 1111, 1117 (D.C. Cir. 1968), have their place in voluntary arbitration of the terms of a labor contract and will tend to improve and make more livable the arbitral result. Of course, if for any reason the parties prefer a more limited arbitration, they can provide for it by agreement. Here the parties agreed in the contrary sense.

We add that there is a general policy favoring voluntary arbitration in the labor field[14] which speaks against im-

---

[14] See *John Wiley & Sons* v. *Livingston,* 376 U.S. 543, 549-550 (1964); *Chattanooga Mailers Local 92* v. *Chattanooga News-Free Press Co.,* 542 F.2d 1305, 1314 (6th Cir. 1975).

posing a narrowing interpretation on § 9, fifth paragraph. On the other hand, there is an understandable attitude of wariness about arbitration forced on a party. *Massachusetts Nurses Ass'n* v. *Lynn Hosp.*, 364 Mass. 502 (1974), was a case of forced arbitration under c. 150A, § 9A (nurses in health care facilities), where we were, in addition, aided by express statutory language in finding that the arbitration was intended to be limited to the subjects of mandatory bargaining. The same theme appears in § 4 of the statute (St. 1973, c. 1078) that enacted c. 150E, § 9. Section 4 provided for forced interest arbitration in the event of impasse in bargaining between representatives of police officers or firefighters and municipal authorities. It stated, in effect, that the arbitration in police matters was to be limited to the subjects of mandatory bargaining.[15] By contrast, § 9, fifth paragraph, which invokes voluntary arbitration, is to be understood as it reads, without artificial constriction. It finds its boundaries, however, in a general concept discussed below.

4. The School Committee argues, secondarily, that if agreements for interest arbitration under § 9, fifth paragraph, are not confined to mandatory subject matter, still some nonmandatory subjects must fall outside that statutory provision because they are so central to educational policy that a school committee cannot relinquish control over them even with its own consent and even to an impartial arbitrator. Cf. *School Comm. of Hanover* v. *Curry*, 369 Mass. 683 (1976); *School Comm. of Braintree* v. *Raymond*, 369 Mass. 686 (1976) (deciding in the circumstances of the cases that abolition of a school position was not a proper subject of grievance arbitration). We do not dispute the School Committee's proposition, and we share a concern that public officials should not regard § 9, fifth paragraph, as an easy way out of their responsibilities to the electorate.

---

[15] The State Labor Relations Board in *IAFF, Local 1009 & Worcester*, 2 M.L.C. 1239, 1243 (Dec. 15, 1975), suggested in dictum that the same should hold for firefighters, the other class to which forced arbitration applied.

School Committee of Boston *v.* Boston Teachers Union.

As we learn from *Boston Teachers Local 66* v. *School Comm. of Boston,* 370 Mass. 455 (1976) (the context was grievance arbitration), problems negotiated between a teachers union and a municipal authority are often composites of issues affecting the employment relationship and issues affecting the educational regime; indeed, it is hard to think of questions worth negotiating that are not of this composite character. There are some problems in which the ingredient of educational policy is so comparatively heavy that even voluntary arbitration would be excluded; others in which that predominance is absent and arbitration is in order if the parties agree. As *Boston Teachers,* just cited, states, in the absence of more particular statutory definition, there is no escape from proceeding "on a case by case basis." *Id.* at 464 n.5. See also the triad of cases, *School Comm. of Danvers* v. *Tyman, ante,* 106 (1977); *Dennis-Yarmouth Regional School Comm.* v. *Dennis Teachers Ass'n, ante,* 116 (1977); *School Comm. of W. Bridgewater* v. *West Bridgewater Teachers' Ass'n, ante,* 121 (1977).

Examining the items in question here, we think none has the prerogative quality that should exclude submission to arbitration if the parties so agree.

The "health and welfare" fund dealt with in Item 120 (first paragraph) dated back to the collective bargaining agreement that became effective on September 1, 1968. The School Committee is required to contribute to the fund, from which payments are made to "covered teachers" for their health and welfare, including benefits for hospitalization and surgery. The award vested administration of the fund in five trustees appointed by the Teachers Union, a change from the existing arrangement which provided also for five trustees consisting of the members of the School Committee as from time to time constituted. This was a change in the handling of an element of compensation. Cf. *Kerrigan* v. *Boston,* 361 Mass. 24, 28-29 (1972). The employment relationship, not educational policy, was implicated. If there may be some doubt whether the matter could be called a subject of mandatory bargaining (see

*NLRB* v. *Local 964, United Bhd. of Carpenters,* 447 F.2d 643, 646 [2d Cir. 1971]), we think it was plainly a proper subject of voluntary arbitration.[16]

As to the severance pay question (Item 119), there had been a longstanding dispute about defaults under the collective agreements. Indeed an action seeking a declaration regarding severance pay for the period from September 1, 1969, through August 31, 1974, was pending in the Superior Court when the award came down. The "final best offer" had proposed payment on certain terms and disposal of the action, and the award required payment on other terms. If this matter failed of being one for mandatory bargaining because it related to persons who were not current employees (see *Allied Chem. & Alkali Workers Local 1* v. *Pittsburgh Plate Glass Co. Chem. Div.,* 404 U.S. 157 [1971]), it was nevertheless not a prerogative subject beyond an arbitration intended to substitute for collective bargaining. (Claimed failures to abide by past labor contracts are commonplace matters considered in current bargaining.[17])

Under Item 178, the award stated: "Each pupil reading two or more years below grade level will be provided with a remedial reading program. Sufficient remedial reading specialists will be employed to develop and conduct such programs." This was by no means a curricular innovation, as appears from the terms of the collective agreements running back to 1966 which treated the same subject (and

---

[16] There is nothing in the argument that the change of trustees violated the terms of the trust and was thus invalid. The trust instrument reserved to a majority of the trustees the power to amend its terms by a writing signed by them, and this was sufficiently complied with by the submission agreement eventuating in the award. The fund, it should be added, was created as a result of collective bargaining and has remained a feature of the bargaining ever since.

An argument based on G. L. c. 203, § 12 (removal of trustees by the court), is out of point, as the statute does not affect amendment of a trust in the manner provided in the trust instrument.

[17] The suggestion that the award on this point was illegal as a "gratuity" is unrealistic and fails in the light of *Fitchburg Teachers' Ass'n* v. *School Comm. of Fitchburg,* 360 Mass. 105, 107 (1971).

with stress not on inaugurating a program but on the personnel required). Educational policy was not in question; the award was rather directed to fixing the level of need for the kind of instruction required and providing adequate teaching personnel to meet it. The situation is close to that of the *Boston Teachers* case, *supra* at 462-463, where the terms of an agreement governing the supply of substitute teachers were held a proper subject of bargaining not invading the exclusive prerogatives of the School Committee; thus they were amenable to the grievance procedures of the contract. Closer to the prerogative line were contract provisions for evaluation procedures for nontenured teachers, alleged breaches of which were nevertheless considered to be grievances subject to arbitration in the triad of cases cited above. We need not go so far as to claim that Item 178 presented a subject for mandatory bargaining, although that would be quite arguable: there was reasonable connection both to "conditions of employment" and "standards of productivity and performance" (see note 11, *supra*). Cf. *Fire Fighters Local 1186* v. *Vallejo,* 12 Cal. 3d 608, 615, 620-621 (1974); Wollett, The Bargaining Process in the Public Sector: What is Bargainable? 51 Ore. L. Rev. 177, 180 (1971). In all events it was a proper matter for bargaining and hence for interest arbitration under § 9, fifth paragraph.[18]

*Judgment affirmed.*

---

[18] Although not, of course, binding on us, the views of the State Labor Relations Commission in the following cases (all involving claims of unfair labor practice for refusal to bargain in good faith) will be found interesting: *Boston School Comm. & Boston Teachers Local 66,* 3 M.L.C. 1148 (April 15, 1977); *Danvers & Local 2038, IAFF,* 3 M.L.C. 1141 (April 6, 1977); *Groton School Comm. & Groton Teachers Ass'n.* 1 M.L.C. 1221 (Dec. 17, 1974). See also *West Hartford Educ. Ass'n* v. *DeCourcy,* 162 Conn. 566, 576-577 (1972); *Susquehanna Valley Cent. School Dist. at Conklin* v. *Susquehanna Valley Teachers' Ass'n,* 37 N.Y.2d 614 (1975); *Board of Educ. of Union Free School Dist. No. 3* v. *Associated Teachers of Huntington, Inc.,* 30 N.Y.2d 122 (1972).