SCHOOL COMMITTEE OF BOSTON & others *vs.* BOSTON
TEACHERS UNION, LOCAL 66, AMERICAN FEDERATION OF
TEACHERS (AFL-CIO).

Suffolk. March 5, 1979. — May 11, 1979.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Arbitration,* School committee. *School and School Committee,*
Arbitration, Collective bargaining.

An arbitrator's award directing a school committee to consult with a
teachers union pursuant to a collective bargaining agreement prior
to instituting elementary school final examinations did not improp-
erly intrude into an area reserved for the judgment of the school
committee and was enforceable. [72-73]

CIVIL ACTION commenced in the Superior Court on May
17, 1978.

The case was heard by *Ronan,* J.

The Supreme Judicial Court granted a request for di-
rect appellate review.

*Alan J. McDonald (Gabriel O. Dumont, Jr.,* with him)
for the defendant.

*Jay F. Jason,* Assistant Corporation Counsel (*Kevin F.
Moloney,* Assistant Corporation Counsel, with him) for
the School Committee of Boston.

HENNESSEY, C.J. In this case we again consider the
legal barriers imposed on judicial enforcement of arbitral
awards arising from public sector labor-management
grievance proceedings. The Boston Teachers Union (un-
ion), defendant, appeals from an order by a judge of the
Superior Court vacating an arbitrator's award which di-
rected the plaintiff, the School Committee of Boston (com-
mittee), to comply with its contractual promise to consult
the union prior to instituting a change in a matter which
is a "proper subject" for collective bargaining.

Our review herein is confined to the following narrow question: whether the arbitrator's award substantially interferes with the school committee's ability to formulate and administer educational policy. Because there are subjects which no school committee is free to bargain away to a union or delegate to an arbitrator, arbitral awards concerning these issues are subject to judicial examination. If an award violates this principle, it should be vacated. This may be true even in a case, like the instant one, where the school committee concedes that the matter is arbitrable within the meaning of the contractual language. In the present case, however, we discern no matter of educational management imperiled by enforcement of the arbitrator's order. We therefore reverse the decision of the Superior Court and confirm the award of the arbitrator.

We summarize the facts as discussed in the arbitrator's decision. The union and the committee were parties to a collective bargaining agreement which, by its own terms, was effective for the period between September 1, 1976, and August 31, 1978. Article X of the agreement, captioned "Handling of New Issues," provided that "[w]ith respect to matters not covered by this Agreement which are proper subjects for collective bargaining the Committee agrees it will make no changes without prior consultation and negotiation with the Union." Prior to the 1976-1977 school year the committee had no policy to require elementary school final examinations. Indeed, no provision relating to this subject was included in the agreement; nor was such a policy ever discussed in the course of negotiations leading to the agreement. However, on or about May 23, 1977, the committee, through its representatives, announced and thereafter implemented a decision to hold elementary school final examinations on June 20-22, 1977, without prior consultation or negotiation with the union.

As a result of the committee's unilateral actions, the union, after the school year had ended,[1] processed a griev-

---

[1] According to its witnesses, union members complied with the final examination under protest.

ance in accordance with the collective bargaining agreement[2] and ultimately filed a demand for arbitration.[3] At the hearing before the arbitrator, union witnesses testified that the short notice of the examination requirement — a week or ten days in some cases — caused a significant increase in the amount of out-of-school work which teachers were required to perform. Twenty or more hours were spent by the typical teacher, after school hours and on weekends, reviewing course material covered for the year and preparing the examinations. No teacher was given time during the regular work day to prepare examinations, and no additional compensation was provided teachers for this extra work.[4] Based on these facts, the union contended that the decision to institute elementary school final examinations was a "proper subject of bargaining" which, under Article X, required consultation with the union before the committee was free to act unilaterally. The committee argued, in opposition, that, according to the final paragraph of the agreement and to State law, it had "complete authority over the policies and administration of the schools . . . ."[5] The power to establish a policy calling for the administra-

[2] Article VII-A of the collective bargaining agreement defined a grievance as: "[A] complaint (1) that there has been as to a teacher a violation, misinterpretation or inequitable application of any of the provisions of this agreement, or (2) that teacher has been treated unfairly or inequitably by reason of any act or condition which is contrary to established policy or practice governing or affecting employees . . . ."

[3] It may be surmised from Article VIII of the labor contract that the parties agreed to arbitrate matters "involv[ing] the meaning, interpretation or application of an express provision of the contract."

[4] The union also contended that, because the committee failed to issue adequate guidelines for the preparation of examinations, teachers were required to expend additional time consulting with colleagues in an effort to establish skeletal standards so that the resulting exams would have at least a modicum of homogeneity.

[5] In its "Conclusion," the agreement stated: "In our comparatively new and untried field of collective bargaining the parties have sought

tion of final examinations to elementary school students, the committee claimed, was within that grant of authority, and, as such, negotiations on this question were removed from whatever bargaining obligations the committee otherwise held.

Determining that the new final examination was a proper subject for bargaining and therefore subject to advance consultation under Article X of the labor contract, the arbitrator found for the union and ordered the committee to bargain. But, pursuant to concurrently filed motions to vacate and to confirm the arbitral award,[6] a judge of the Superior Court deemed the arbitrator's award to be invalid as a matter of law, evidently in the belief that the award would unduly infringe on the exclusive prerogative of the committee to establish or change educational policy. We granted the union's application for direct appellate review.

---

to define and resolve the proper interest of the teachers in their rates of compensation and the conditions under which they perform their important duties.

"At the same time the teachers acquire a vehicle, through this partnership with the Committee, which enables them to bring to bear on the growing problems inherent in the advancement of education, their intimate knowledge and experience on matters of professional concern. Also the teachers find a value in this association and contact with the policy-making body.

"Equally, it is established that the Committee has complete authority over the policies and administration of the schools which it exercises under the law."

[6] Chapter 150E, § 8, of the General Laws makes binding arbitration of public employee labor disputes enforceable under the provisions of G. L. c. 150C. Accordingly, a successful party to arbitration may bring an action in Superior Court to confirm the award, G. L. c. 150C, § 10, or a losing party may seek in the same forum to vacate the award for any of five enumerated grounds, one of them being, as contended here, that the "arbitrator . . . exceeded [his] powers or rendered an award requiring a person to commit an act or engage in conduct prohibited by state or federal law." G. L. c. 150C, § 11 (a) (3), inserted by St. 1959, c. 546, § 1.

378 Mass. 65                                      69

School Committee of Boston *v*. Boston Teachers Union, Local 66.

We note at the outset that the issue before us is not whether the union grievance was arbitrable under the labor agreement. See *School Comm. of Southbridge* v. *Brown*, 375 Mass. 502, 504 (1978); *School Comm. of Agawam* v. *Agawam Educ. Ass'n*, 371 Mass. 845, 847 (1977); *Nolde Bros.* v. *Local 358, Bakery & Confectionary Workers Union*, 430 U.S. 243 (1977); *Acting Superintendent of Schools of Liverpool Cent. School Dist.* v. *United Liverpool Faculty Ass'n*, 42 N.Y.2d 509, 514 (1977). The school committee concedes that the matter was arbitrable within the meaning of the contractual language. Nor are we asked to decide whether the arbitrator erred in his interpretation of the relevant contractual provision. Both parties acknowledge that courts do not review the merits of an arbitrable matter. See *School Comm. of Southbridge* v. *Brown, supra*; *School Comm. of Danvers* v. *Tyman*, 372 Mass. 106, 115 (1977); *Greene* v. *Mari & Sons Flooring Co.*, 362 Mass. 560, 563 (1972); *United Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-583 (1960). By agreeing to arbitration, the parties commit such covered subjects to the final determination of the arbitrator. *School Comm. of Hanover* v. *Curry*, 369 Mass. 683, 685 (1976).

The single issue presented in this case is whether there is a noncontractual legal barrier to the enforcement of the arbitrator's award directing the committee to consult the union prior to implementing elementary school final examinations, or, stated more specifically, whether the enforcement of the terms of the collective bargaining agreement, as interpreted by the arbitrator, improperly intrudes into an area reserved for the judgment of the school committee regarding educational policy.[7]

---

[7] Although the collective bargaining agreement from which this dispute arose expired last year, we do not believe the issue is moot. Both parties indicate that the subject is one of continuing contention between them. Moreover, since the facts and circumstances of this case create a substantial likelihood of mootness prior to the completion of any future litigation of these same issues, *First Nat'l Bank* v.

It is by now well recognized that the subjects of public sector collective bargaining are more restricted than those in private sector labor relations. See, Clark, The Scope of the Duty to Bargain in Public Employment, in Labor Relations Law in the Public Sector 82-83 (A. Knapp, ed. 1977). "Public policy, whether derived from, and whether explicit or implicit in statute or decisional law, or in neither" may limit the ability of a public employer, such as a school committee, to bind itself to a given contractual provision or to delegate to an arbitrator the power to bind it. *School Comm. of Hanover* v. *Curry, supra,* quoting from *Susquehanna Valley Cent. School Dist.* v. *Susquehanna Valley Teachers' Ass'n,* 37 N.Y.2d 614, 616-617 (1975).[8] While this principle may be raised in varied contexts — in unfair labor practice proceedings before the Labor Relations Commission,[9] in actions to stay arbitration under G. L. c. 150C, § 2(*b*),[10] or as here, in actions to vacate or confirm arbitral awards[11] — the

*Haufler,* 377 Mass. 209, 211 (1979), we think that the case could go forward, in any event, as one "capable of repetition, yet evading review." *Karchmar* v. *Worcester,* 364 Mass. 124, 136 (1973), quoting from *Southern Pac. Terminal Co.* v. *ICC,* 219 U.S. 498, 515 (1911). But see *Commonwealth* v. *Lane's Furniture Co,* 377 Mass. 873 (1979).

[8] See *Watertown Firefighters, Local 1347* v. *Watertown,* 376 Mass. 706 (1978); *Doherty* v. *School Comm. of Boston,* 363 Mass. 885 (1973); *Chief of Police of Dracut* v. *Dracut,* 357 Mass. 492 (1970). But see G. L. c. 150E, § 7 (*d*), by which terms of collective bargaining agreements prevail over certain enumerated statutes.

[9] See G. L. c. 150E, § 10 (*a*) (5), making it a prohibited practice for a public employer to refuse to bargain collectively in good faith with the exclusive representative of its employees. See also *Bellingham School Comm. & Bellingham Teachers Ass'n,* 5 M.L.C. 1480 (1978); *Leominster School Comm. & Leominster Teachers Ass'n,* 4 M.L.C. 1512 (1977); *Andover & Local 1658,* 4 M.L.C. 1086 (1977); *Danvers & Local 2038, IAFF,* 3 M.L.C. 1559 (1977).

[10] E.g., *Berkshire Hills Regional School Dist. Comm.* v. *Berkshire Hills Educ. Ass'n,* 375 Mass. 522 (1978); *School Comm. of Southbridge* v. *Brown,* 375 Mass. 502 (1978); *School Comm. of Burlington* v. *Burlington Educators Ass'n.,* 7 Mass. App. Ct. 41 (1979).

[11] E.g., *Watertown Firefighters, Local 1347* v. *Watertown, supra; School Comm. of W. Springfield* v. *Korbut,* 373 Mass. 788 (1977).

analysis to be utilized is essentially the same in all instances: whether the ingredient of public policy in the issue subject to dispute is so comparatively heavy that collective bargaining, and even voluntary arbitration, on the subject is, as a matter of law, to be denied effect. *School Comm. of Boston* v. *Boston Teachers Local 66*, 372 Mass. 605, 614 (1977).[12] Underlying this development is the belief that, unless the bargaining relationship is carefully regulated, giving public employees the collective power to negotiate labor contracts poses the substantial danger of distorting the normal political process for controlling public policy. See Wellington & Winter, The Limits of Collective Bargaining in Public Employment, 78 Yale L.J. 1107 (1969).[13]

In the public education setting, this court on several occasions has alluded to subjects which are beyond the scope of collective bargaining: specific appointment[14] and tenure[15] determinations, as well as school committee deci-

---

[12] Of course, the Legislature is free specifically to define or enumerate the proper subjects for public sector collective bargaining. See Cal. Gov't Code § 3543.2 (Deering 1979); Haw. Rev. Stat. § 89-9(d) (1976). To date, it has failed to do so. See generally Sackman, Redefining the Scope of Bargaining in Public Employment, 19 B.C.L. Rev. 155 (1977).

[13] See also T. van Geel, Authority to Control the School Program 126-127 (1976): "The basis of the power of the public sector unions is the fact that they are organized and active; [that] public officials are often anxious to avoid the disruption of public services; [that] public officials have an incentive to give away much to unions to gain their political support at election time, especially when much of what is given away may be unknown to the public or only have economic and political implications long after these particular officials have left office; and . . . that other political groups are often not as organized and have [less] political resources than the unions. Thus, given the power of the unions, to broadly define the scope of negotiations runs the risk of permitting unions to determine the nature and quality of the public service to be offered, an issue of great concern to the community at large and especially to parents in the case of public education."

[14] *Berkshire Hills Regional School Dist. Comm.* v. *Berkshire Hills Educ. Ass'n, supra.*

[15] *School Comm. of Danvers* v. *Tyman*, 372 Mass. 106 (1977).

sions to abolish positions[16] have been found to be within the zone of management prerogative over educational policy. See G. L. c. 71, §§ 37-38. Issues such as these are committed to the judgment of the school committee alone. See *Boston Teachers Local 66* v. *School Comm. of Boston*, 370 Mass. 455, 462 (1976). However, even where certain ultimate decisions may or have been deemed to be so laced with educational policy as to be beyond the reach of bargaining and arbitration, we have upheld arbitral awards which have merely involved questions of adherence by the school committee to *procedures* set forth in the collective bargaining agreement for resolving such determinations. See *School Comm. of W. Springfield* v. *Korbut*, 373 Mass. 788, 795-796 (1977); *Bradley* v. *School Comm. of Boston*, 373 Mass. 53, 59-60 (1977); *School Comm. of Danvers* v. *Tyman, supra* at 114-115; *Dennis-Yarmouth Regional School Comm.* v. *Dennis Teachers Ass'n*, 372 Mass. 116, 117 (1977); *School Comm. of W. Bridgewater* v. *West Bridgewater Teachers' Ass'n*, 372 Mass. 121, 122-123 (1977). Other courts, we might observe, have mandated bargaining regarding the *impact* of educational policy decisions in cases where the employer normally would not be required to bargain over the decision itself. See, e.g., *San Juan Teachers Ass'n* v. *San Juan Unified School Dist.*, 44 Cal. App. 3d 232 (1974); *West Hartford Educ. Ass'n* v. *DeCourcy*, 162 Conn. 566 (1972); *Board of Educ. of Asbury Park* v. *Asbury Park Educ. Ass'n*, 145 N.J. Super. 495 (1976). Annot., 84 A.L.R.3d 242 (1978).[17]

In the light of our previous cases, we think that the judge erred in vacating the instant arbitral award. We do not believe that there is an "educational policy" barrier

---

[16] *School Comm. of Braintree* v. *Raymond*, 369 Mass. 686 (1976). *School Comm. of Hanover* v. *Curry*, 369 Mass. 683 (1976).

[17] We note that the State Labor Relations Commission has adopted this view. *Groton School Comm. & Groton Teachers Ass'n*, 1 M.L.C. 1221 (1974).

to the enforcement of the arbitrator's order. Initially, we note that the question submitted to the arbitrator was not whether the committee, in the absence of a consultation clause, could unilaterally institute elementary school final examinations,[18] a question heavily laden with policy considerations, but merely whether there had been a violation of the agreed-to procedures in instituting such a policy without discussing the matter with the union in advance. Cf. *School Comm. of W. Springfield* v. *Korbut, supra* at 796. Moreover, the arbitral award did no more than order the committee to refrain from implementing an elementary school final examination policy without first consulting the union. Significantly, the arbitrator in no way prohibited the committee from eventually instituting such a policy. Nor did he direct the committee to agree to any particular agreement, or indeed any agreement, with the union on that specific subject. He simply ordered the committee to comply with its contractual promise to bargain over the issue before it took any action.

While we do not foreclose the possibility that a clause of this nature might in some instances improperly obstruct the freedom of a school committee to promulgate and administer educational policy, nothing in this record suggests that adherence to its minimal bargaining obligation poses any threat to the committee's ability freely to develop policy here. Cf. *Port Washington Union Free School Dist.* v. *Port Washington Teachers' Ass'n,* 54 App. Div. 2d 984 (N.Y. 1976); *North Babylon Bd. of Educ.* v. *North Babylon Teachers' Organization,* 44 App. Div. 2d 836 (N.Y. 1974). Rather, the committee more likely stands to benefit by such consultation, inasmuch as the union, consisting of trained professionals, "may have much to contribute towards the Board's adoption of sound and suitable" elementary school final examinations. *Dunellen Bd. of Educ.* v. *Dunellen Educ. Ass'n,* 64 N.J. 17, 31-32 (1973). See note 5, *supra.*

---

[18] We express no opinion on this question.

Accordingly, we reverse the judgment of the Superior Court. Since the committee is legally capable of performing the arbitration award, we remand the case to the Superior Court with instructions that the award be confirmed.

*So ordered.*