The TIPPECANOE EDUCATION ASSOCIATION, Defendant-Appellant,

v.

The BOARD OF SCHOOL TRUSTEES OF the TIPPECANOE SCHOOL CORPORATION, Plaintiff-Appellee.

No. 2–181A5.

Court of Appeals of Indiana, Fourth District.

Dec. 1, 1981.

Rehearing Denied Jan. 13, 1982.

Wayne O. Adams, III, Donald J. Graham, Bingham, Summers, Welsh & Spilman, Indianapolis, for defendant-appellant.

Susan B. Tabler, Ice, Miller, Donadio & Ryan, Indianapolis, for plaintiff-appellee.

MILLER, Presiding Judge.

This is an appeal from a judgment of the Tippecanoe Circuit Court vacating and setting aside an arbitration award rendered in a dispute between the Board of School Trustees (Board) of the Tippecanoe School Corporation (School Corporation) and the Tippecanoe Education Association (TEA), an organization representing licensed employees of the School Corporation. The Court granted the motion of the Board, plaintiff-appellee, to vacate the award under the Indiana Uniform Arbitration Act [1] on the ground the arbitrator exceeded his power in purporting to determine the involuntary transfer of a teacher within the school system did not promote the "general welfare" of the Corporation. On appeal, the TEA contends the Master Contract between the Board and the TEA gives the arbitrator the authority to make such determinations with respect to transfers and that the trial court and this Court should properly defer to the arbitrator's decision. We affirm the trial court's ruling setting aside the arbitration award.

The basic facts pertinent to the instant appeal are as follows: The underlying dispute concerns the involuntary transfer of Richard McKinnis, formerly a physical-education teacher at Harrison High School, to a similar position at a junior high school within the system. The transfer occurred after the head basketball coach at Harrison resigned his position effective the 1978–79 school year, and the Board decided to hire a man named Gunn to fill the basketball coach position. Coaches must be employed as teachers in addition to their coaching duties. Accordingly, the Board determined it was in the best interests of the school and the Corporation in general to transfer McKinnis (without loss of pay or benefits) and substitute Gunn as one of the three male physical education teachers allocated to Harrison. The recommendation of the Harrison principal, as approved by the Superintendent and the Board, was as follows: "I believe it is important for personnel serving as head varsity coaches to be assigned instructional duties *at the same building that they are assigned coaching duties.* This would be in the best interest of both the school and the students with whom the coaches are working." (Emphasis added.)

On June 2, 1978, McKinnis filed a grievance generally alleging his transfer violated Article IV, Section 4 of the Master Contract between the Board and the TEA, which provides in part as follows:

"In order to promote an orderly administration of transfers, the following criteria shall apply:

a. area(s) of certification;

b. professional development—graduate credits in subject area requested;

c. evaluation report;

1. Ind.Code 34–4–2–1 *et seq.*

d. prior experience in the grade level or subject area requested;

e. opportunity for professional growth, if applicable;

f. length of service to the corporation.

The teacher shall be notified of the action taken on the transfer request, and if denied, the reason given.

*The Board reserves the right to make involuntary transfers for the general welfare of the corporation.* Where involuntary transfers are necessitated, a conference between the employee involved and the appropriate administrative staff shall precede the transfer. The teacher will be fully informed of the reasons for the transfer at this meeting, and the criteria set out in a. through f. above will be considered in making the decision." (Emphasis added.)

Pursuant to the provisions of the Master Contract, the TEA demanded arbitration of McKinnis' grievance, and a hearing was set before Arbitrator Duane L. Traynor on October 31, 1978.

The grievance submitted to arbitration did not allege in what specific manner the Board violated Article IV, Section 4, *supra.* The arbitrator determined, however, the Board "followed the criteria of Section 4"[2] in making its determination, that an appropriate conference was held with McKinnis preceding the actual transfer, and that the Board did not consider alleged improper criteria in its decision to transfer McKinnis. The arbitrator determined "[t]he Grievant was chosen on the basis of being the lowest of the persons who were considered for a transfer to fill another teaching position in his field of physical education and health." The arbitrator further decided, however, in ordering the Board to restore McKinnis to his former position, "[i]t seems to this arbitrator that someone has to define for the parties what is encompassed in the words 'general welfare of the corporation' or at least what is not encompassed . . ." where a transfer is made in connection with a decision to hire a new teacher.[3] He ultimately concluded, based on definitions of "welfare"

---

2. TEA somewhat confusingly argues in its reply brief the arbitrator found the Board's conduct to be "arbitrary and unusual" in that the Board allegedly failed to consider Gunn's qualifications "in the evaluation of the transfer specified in Article IV, Section 4" pertaining to the transfer of McKinnis. The basis of the arbitrator's decision is considered *infra.* We note, however, that in addition to concluding the Board did follow the criteria of Section 4 with respect to McKinnis, the arbitrator also determined "[t]he contract doesn't address itself specifically to the problem here presented involving the hiring of a new teacher and placement thereof."

3. Interestingly, the arbitrator determined, without expressing his precise reasoning, that "[s]uch determination is not the sole prerogative of the school *as Article V, Section 6(e) would indicate.*" (Emphasis added.) Article V, Section 6 of the Master Contract states in part:

"Section 6—Other Provisions Related to Grievance Procedure

It shall be the function of the arbitrator, and he shall be empowered, *except as his powers are limited below*, after due investigation, to make a decision in cases of the alleged violation of the specific articles and sections of this Agreement:

(a) he shall have *no power to add to, subtract from, disregard, alter, or modify any of the terms of this Agreement*: . . .

. . . . .

(d) he shall have no power to change any practice, policy, or rule of the Board *nor to substitute his judgment for that of the Board as to the reasonableness of any such practices, policy, rule, or any action taken by the Board*, except [as] such rules, policies, or actions may be in conflict with the law or this Agreement. His powers shall be limited to deciding whether the Board has violated the express articles or sections of the Agreement.

(e) *he shall have no power to decide any question which, under this Agreement, is within the responsibility of management to decide.*

In rendering decisions, an arbitrator shall give due regard to the responsibility of management and shall so construe such responsibilities except as they may be specifically conditioned by this Agreement. Likewise he shall give due insight to the interest and rights of the aggrieved teacher.

(f) There shall be no appeal from an arbitrator's decision *if within the scope of his authority as set forth above.* It shall be final and binding on the Association, its members, the employee or employees involved, and the Board and its agents." (Emphasis added.)

derived from the "Living Webster Encyclopedic Dictionary," as follows:

"[T]he words 'general welfare' must be construed to refer to the School's best interest when looked at from the viewpoint of the whole corporation system. This would include a determination as to what is the best for the students, the teachers, parents and the public. Here one has to concede that a basketball coach developes basketball players and developes them into, hopefully, a winning team. He deals personally with a limited number of boys who have expressed an interest in playing basketball or whose talents he recognizes and attempts to interest in playing basketball. With the exception of those he recruits, [sic] this is done primarily on the basketball courts. The Principal admits one can successfully teach in one school and coach in another. His justification for assigning Gunn to Harrison High School as a replacement teacher for the Grievant is his belief that it is important for a head coach to see the members of his squad during class time, to see that they maintain their academic standards. *This might help a few players but it seems to stretch ones [sic] imagination to believe that it is of such import as to have an effect upon the whole corporation school system.*

When one considers that the contract seeks to preserve a teacher's right to continue in his same position and school if he so desires, *I have to conclude that the reasons given for having a head coach teach and coach in the same school does [sic] not establish that to do so enhances the general welfare of the corporation as I have defined it.*" (Emphasis added.)

As noted above, the trial court set aside the decision of the arbitrator ordering the reinstatement of McKinnis to his former position. After concluding it had jurisdiction pursuant to the Uniform Arbitration Act, the court made "Findings of Fact" including the following:

"9. The Arbitrator held that he should examine the transfer in light of 'the general welfare of the corporation.'

10. The collective bargaining agreement and the Law of Indiana reserve to the plaintiff Board of Trustees, the power to decide what is for the 'general welfare of the Corporation' in deciding to transfer a teacher.

11. The Arbitrator is not authorized to substitute his judgment for the judgment of the plaintiff Board in defining or determining the 'general welfare of the corporation.'

12. The award of the Arbitrator is unreasonable and exceeds his powers and it cannot be corrected without affecting the merits of the decision and it should be vacated."

## DECISION

The essential question raised by the instant appeal is whether the trial court correctly concluded the arbitrator exceeded his authority in applying his own interpretation of the "general welfare" of the School Corporation to McKinnis' transfer. The TEA argues the arbitrator implicitly had authority to construe and apply the phrase "general welfare" with respect to the transfer by virtue of a provision in the parties' Master Contract stating arbitration would be employed to resolve "specific claims of violation, misapplication, or misinterpretation" of the Contract. In response, the Board contends 1) the Master Contract does not delegate to the arbitrator authority to decide when a transfer is for the Corporation's "general welfare," but instead expressly reserves that decision (subject to the procedural constraints of Article IV, Section 4, *supra*) to the Board itself; and 2) regardless of the language of such contract, the law of Indiana does not permit the Board to delegate such educational policy decision-making authority.

Because we agree with the Board's second contention—that by law, only the Board may exercise its responsibility to determine when a transfer is for the Corporation's "general welfare"—we find it unnecessary to construe the Master Contract it-

self.[4] Based on the "prohibited contract" provisions of the Certificated Educational Employee Bargaining Act (CEEBA), Ind. Code 20–7.5–1–1 *et seq.*, as interpreted by our courts, we believe the trial court correctly found the arbitrator did exceed his authority.

■ As the trial court initially concluded, (a determination TEA does not challenge) its authority to review the arbitrator's decision is derived from the Indiana Uniform Arbitration Act, an act generally pertaining to "arbitration agreement[s] between employers and employees," IC 34–4–2–1, which this Court has recognized applies to labor arbitration agreements between public employers and their employees. *School City of East Chicago v. East Chicago Federation of Teachers, Local # 511,* (1981) Ind.App., 422 N.E.2d 656; *Wagner v. Kendall,* (1980) Ind. App., 413 N.E.2d 302. The Act provides in pertinent part:

"Upon application of a party, the court shall vacate an award where . . .

(3) the arbitrators exceeding [exceeded] their powers and the award can not be corrected without affecting the merits of the decision."

IC 34–4–2–13.

In applying the Uniform Arbitration Act, this Court has recently held an arbitrator may be said to have exceeded his authority where "he affords a form of relief that public policy does not permit the parties to voluntarily agree to" despite the fact he

may have jurisdiction over the subject generally and over the parties to the dispute. *School City of East Chicago v. East Chicago Fed'n of Teachers, Local # 511, supra* at 662. In *School City of East Chicago,* this Court held, *inter alia,* that despite an agreement containing a broad arbitration clause imposing few, if any, express limitations on the arbitrator's authority, an award purporting to assess punitive damages against one of the parties was void for reasons of public policy.

■ We similarly believe considerations of public policy—here expressed by the Legislature in CEEBA—prohibit the arbitrator in the instant case from assuming the Board's responsibility for deciding whether the transfer of a teacher is for the Corporation's "general welfare."

In its prologue to CEEBA, our Legislature has in part expressed its intent as follows:

"The relationship between school corporation employers and certificated school employees is not comparable to the relationship between private employers and employees among others for the following reasons: (i) a public school corporation is not operated for profit but to insure the citizens of the state rights guaranteed them by the Indiana state constitution: (ii) the obligation to educate children and the methods by which such education is effected will change rapidly with increasing technology, the needs of an advancing civilization and requirements for substan-

4. We note, however, the persuasive authority cited by the TEA, that on appeal *construction* of arbitration contracts is confined to determining whether the party seeking arbitration is making a claim which on its face is governed by the contract. *E. g., Kaleva-Norman-Dickson School District No. 6 v. Kaleva-Norman-Dickson School Teachers' Ass'n,* (1975) 393 Mich. 583, 227 N.W.2d 500. In *Kaleva,* the Supreme Court of Michigan reversed the trial court's judgment (affirmed by the Court of Appeals) enjoining arbitration of the school district's decision not to renew a probationary teacher's contract. The relevant contract provided "[n]o teacher shall be disciplined, reprimanded, reduced in rank or compensation, or deprived of any professional advantage without just cause" and further gave the arbitrator authority with respect to "violation, misinterpretation or mis-

application of any provision" of the agreement. In its "most limited" holding, the Supreme Court of Michigan concluded "[t]he rule promulgated by the United States Supreme Court [in *United States Steelworkers of America v. Warrior & Gulf Navigation Co.,* (1960) 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409] puts the burden on the party who would exclude a matter from a general arbitration clause to do so expressly and explicitly," and that in the case before it, it could not be said with positive assurance the arbitration clause was not susceptible of an interpretation which would govern the dispute despite other language in the contract reserving certain powers for the school. *Id.* at 595, 227 N.W.2d at 506. Accordingly, the injunction against arbitration was dissolved, and the decision of the Court of Appeals was reversed.

tial educational innovation; (iii) *the Indiana general assembly has delegated the discretion to carry out this changing and innovative educational function to the local governing bodies of school corporations, composed of citizens, elected or appointed under applicable law, a delegation which these bodies may not and should not bargain away* ; and (iv) public school corporations have different obligations with respect to certificated school employees under constitutional and statutory requirements than private employers have to their employees." (Emphasis added.)

IC 20–7.5–1–1.

In addition, the Legislature has further provided in IC 20–7.5–1–6(b), with respect to the duties of such local school boards:

"School employers shall have the *responsibility and authority* to manage and direct in behalf of the public the operations and activities of the school corporation *to the full extent authorized by law.* Such responsibility and activity shall include, but not be limited to, to the right of the school employer to . . .

(3) hire, promote, *transfer*, assign and retain employees . . . ." (Emphasis added.)

Finally, the Legislature has unambiguously declared, in IC 20–7.5–1–3:

"Duty to bargain collectively and discuss—Prohibited contract provisions.—On and after January 1, 1974, school employers and school employees shall have the obligation and the right to bargain collectively the items set forth in section 5 [20–7.5–1–5] and shall enter into a contract embodying any of the matters on which they have bargained collectively. *No contract may include provisions in conflict with (a) any right or benefit established by federal or state law, (b)*

school employee rights as defined in section 6(a) [subsection (a) of 20–7.5–1–6] of this chapter, or (c) school employer rights as defined in section 6(b) [subsection (b) of 20–7.5–1–6, supra, creating the responsibility to hire, promote, transfer and retain employees] of this chapter. It shall be unlawful for a school employer to enter into any agreement that would place such employer in a position of deficit financing as defined in this chapter [20–7.5–1–1—20–7.5–1–14], and any contract which provides for deficit financing shall be void to that extent and any individual teacher's contract executed in accordance with such contract shall be void to such extent." (Emphasis added.)

In construing the above statutes this Court observed earlier this year in *Anderson Federation of Teachers, Local 519 v. Alexander* (1981) Ind.App., 416 N.E.2d 1327, 1331, an opinion which surprisingly has not been cited by either party to the instant appeal,[5] that under CEEBA:

"*The scope of collective bargaining by schools, then, is to be restricted because school corporations have duties to the public, to the legislature, and to their employees as individuals, which they must not be permitted to bargain away.* These strictures are made concrete in sections 3 through 6 of the Act. Section 3 of the Act requires that school corporations and teachers bargain collectively on pay, pay-related fringe benefits, hours, and grievance procedures; and authorizes them, by mutual consent, to contract as to various methods relating to teaching as a profession. I.C. 20–7.5–1–3, –5. But the crucial portion of section 3 forbids the parties to agree to any provision in conflict with either the 'rights' of the parties as outlined in section 6 of the Act, or the rights of any person under federal or state law.

---

**5.** We note the law firm representing the TEA in the instant case in the trial court and on appeal filed an amicus curiae brief on behalf of the Indiana State Teachers Association in *Anderson*, which opinion was handed down March 4, 1981. The instant case was fully briefed on May 5, 1981, and oral argument held on November 10, 1981. Where a lawyer knows of legal authority in the controlling jurisdiction directly adverse to the position of his client, he should inform the tribunal of its existence unless his adversary has done so; but, having made such disclosure, he may challenge its soundness in whole or in part. Code of Professional Responsibility, Canon 7, Ethical Consideration 7–23. *See also* Disciplinary Rule 7–106(B)(1).

An inspection of section 6 discloses that while section 3 protects the *rights* [emphasis in original] of school employees, school employers are protected not in their *rights*, but in their *responsibilities and authority.* [emphasis in original] I.C. 20–7.5–1–6. *So the legislature has plainly expressed its intent that the responsibilities and authority of school corporations, as partially described in section 6(b) of the Act, are duties entrusted by the legislature to the sole discretion of school corporations, and can not be restricted in a collective bargaining agreement.*" (Emphasis added in part.)

This Court in *Anderson* ultimately held a school corporation could not enter into a collective bargaining agreement requiring the discharge of employees who failed to agree to pay a representation fee to the Anderson Federation of Teachers, since the relevant statutes quoted above "plainly remove the firing of teachers from the scope of collective bargaining." *Id.* at 1332. The Court noted the statutes impose a "requirement that school employees retain their sole responsibility to hire and fire teachers," and that such responsibility, like the other responsibilities [including authority to transfer, the issue in the instant case] enumerated in IC 20–7.5–1–6, *supra,* "belongs to school boards alone." *Id.* at 1330.

 We believe the construction of CEEBA expressed in *Anderson* would similarly prohibit a school board from delegating to an arbitrator (as the TEA contends the Board did in the instant case) the authority to decide when the transfer of a teacher is for the "general welfare" of the Corporation, since it is apparent such delegation would conflict with the responsibility entrusted to the "sole discretion" of the Board itself, and thus would be contrary to the public policy expressed by our Legislature. *See also School City of East Chicago v. East Chicago Federation of Teachers, supra.*

Thus, it is apparent the TEA's argument that the Board bargained away its discretion to determine when a transfer is for the Corporation's "general welfare" is directly contrary to our Legislature's express intent. In determining the arbitrator was not empowered by the Master Contract to decide what is for the "general welfare" of the Corporation we do not hold, however, as TEA suggests, that the Board may "justify an involuntary decision by *merely declaring* that such transfer is for the general welfare of the Corporation," nor do we conclude the Board has "unrestrained authority to transfer teachers." The trial court purported to decide no more than whether the arbitrator exceeded his jurisdiction in substituting his own definition of "general welfare" for that of the Board. It is apparent, however the arbitrator may intervene where the Board's action conflicts with applicable law or express, lawful Master Contract provisions, and that the Board is required to observe the procedures and criteria specified by Article IV, Section 4, *supra,* in making transfers. Though the arbitrator may not generally substitute his judgment for that of the Board, we believe appropriate review will lie in a proper case for actions involving purely arbitrary, capricious or fraudulent exercise of the powers granted to the Board by the General School Powers Act, Ind.Code 20–5–1–1 *et seq. See generally, e. g., Cooper v. Huntington County Community School Corp.,* (1968) 249 Ind. 653, 232 N.E.2d 887, where it was alleged the school corporation acted "arbitrarily, unjustly, unreasonably, deviously, unnecessarily, capriciously," and in "abuse of discretionary powers" in adopting a plan providing for the construction of a single senior high school building for all students of Huntington County in grades 10 through 12, and our Supreme Court concluded "the legal principles they [the complaining citizens] rely upon and the authority they cite in support thereof are sound; however, the application of such principles to the facts at bar fail[s] to impress us." *Id.* at 657, 232 N.E.2d at 890.

In applying legislative provisions similar to those in CEEBA enumerated above, a variety of other jurisdictions have also concluded a school board may not contractually delegate educational policy determination such as when a transfer or hiring decision

will be for the school corporation's "general welfare." *See e. g., Board of Trustees of Junior College District No. 508 v. Cook County College Teacher's Union, Local 1600,* (1976) 62 Ill.2d 470, 343 N.E.2d 473, (board could not delegate to an arbitrator the right to make decisions concerning the promotion of a teacher); *Illinois Education Association v. Board of Education,* (1975) 62 Ill.2d 127, 340 N.E.2d 7 (board had absolute discretion with respect to non-renewal of a teacher's employment contract), *Dunellen Board of Education v. Dunellen Education Association,* (1973) 64 N.J. 17, 311 A.2d 737 (board's authority to consolidate chairmanships was nondelegable, inviolate, and beyond the reach of an arbitrator); *School Committee of Hanover v. Curry,* (1975) 3 Mass.App. 151, 325 N.E.2d 282 (board's decision to abolish a teaching position was within the exclusive managerial prerogative of the school committee and as such could not have been delegated to the arbitrator for decision).

As the Massachusetts Supreme Court has persuasively observed in considering an issue analogous to that in the case at bar:

> Because there are subjects which no school committee is free to bargain away to a union or delegate to an arbitrator, arbitral awards concerning these issues are subject to judicial examination. If an award violates this principle, it should be vacated. This may be true even in a case, like the instant one, where the school committee concedes that the matter is arbitral within the meaning of the contractual language."

*School Committee of Boston v. Boston Teacher's Union, Local 66,* (1979) 378 Mass. 65, 389 N.E.2d 970, 971. *See also School Committee of Hanover v. Curry, supra,* 325 N.E.2d at 287, where the Court concluded:

> "Such decisions concerning managerial rights in the public sector are qualitatively different from those in the private sector, not only because of the presence of statutes regulating and limiting the public employer, but also because of the necessity of safeguarding public control

over such decisions. To the extent that educational policy issues are subsumed under collective bargaining agreements, public control and effective oversight concerning the decisions of the school committee are diminished. *There is a legitimate area of managerial prerogative over educational policy which is committed to the school committee and which it cannot bargain away, as it could if it were a private party not subject to public control."* (Emphasis added.)

*And see generally* the reasoning of *Hamilton County Hospital v. Andrews,* (1949) 227 Ind. 228, 85 N.E.2d 365 (on petition for rehearing), *cert. denied,* (1949) 338 U.S. 831, 70 S.Ct. 73, 94 L.Ed. 506, where our own Supreme Court concluded a county hospital with statutory authority to adopt rules for certification of physicians could employ a rule for certification in surgery based on standards approved by the American College of Surgeons, because "[i]t was an adoption of a certain standard of training which has not been shown to be unreasonable and was not in any sense a delegation of authority to the American College of Surgeons to determine whether that standard had been complied with in each instance—*that determination rests with the board of trustees of the hospital."* (Emphasis added.) In its prior opinion in *Andrews* the Court emphasized the hospital could not condition a physician's right to practice medicine in the hospital upon the recommendation of an existing staff physician, because by such practice "the hospital delegates to its staff a virtual veto of its right to perform one of its duties," with the unlawful result that "the staff dictates what physicians may practice in the hospital." *Hamilton County Hospital v. Andrews,* (1949) 227 Ind. 217, 225–26, 84 N.E.2d 469, 472.

Accordingly, while the Board is free to adopt procedures and criteria relative to decisions such as the hiring and transfer of teachers, and may bind itself to observe such procedures by express contractual pro-

visions,[6] we believe it is apparent the Legislature did not intend that the Board could delegate to an arbitrator the authority to decide when a transfer or similar Board action is for the "general welfare" of the Corporation, assuming *arguendo* the Master Contract in the instant case so provided.

Thus, based on the foregoing authorities, including *Anderson Federation of Teachers, Local 519 v. Alexander, supra,* and the language of our own Certificated Educational Employee Bargaining Act, including IC 20–7.5–1–3, *supra* pertaining to "prohibited contract provisions," we conclude the arbitrator's decision in the instant case was properly vacated.

The judgment of the trial court is affirmed.

CONOVER and YOUNG, JJ., concur.

---

6. In this regard, the language of IC 20–7.5–1–3, *supra*, prohibiting contract provisions which conflict with the Board's *responsibility* to hire, promote, transfer and retain employees must be read in conjunction with IC 20–7.5–1–5, cited by TEA, which provides in part:

"(a) A school employer shall discuss with the exclusive representative of certificated employees, and may but shall not be required to bargain collectively; negotiate or enter into a written contract concerning or be subject to or enter into impasse procedures on the following matters: . . . selection, assignment or promotion of personnel. . . . "

See *Anderson Federation of Teachers, Local 519 v. Alexander, supra.* When confronted with the interpretation of several sections in a statute, a court is duty bound to give effect to each section. *Evansville-Vanderburgh School Corp. v. Roberts,* (1980) Ind., 405 N.E.2d 895 (on petition to transfer). In *Roberts,* our Supreme Court adopted, *inter alia,* Judge Robertson's conclusion in the earlier, vacated opinion issued by the Court of Appeals at 395 N.E.2d 291 (cited by TEA in the instant appeal without reference to its vacation by the Supreme Court)

that "the employer's rights unilaterally to confer and establish policy cannot be construed as an *ipso facto* excuse for an otherwise established unfair practice." *Evansville-Vanderburgh School v. Roberts, supra,* 405 N.E.2d at 901. The unfair labor practice at issue was the Board's failure to discuss a teacher evaluation plan, as required by IC 20–7.5–1–5, *supra,* with the teachers' bargaining organization. Our Supreme Court further observed, in consonance with the general reasoning expressed in *Anderson Federation of Teachers, Local 519 v. Alexander, supra* :

"While it is true that the evaluation program in the instant case was a discussable matter, we must point out that the statute does speak of specific school employer rights as well as duties. It has long been legally recognized that a right is a privilege which may be exercised by its holder at the holder's discretion. *A duty is an obligation which must be carried out by the one who is subject to it.*" (Emphasis added.)
*Evansville-Vanderburgh School Corp. v. Roberts, supra* at 901.